JOSÉ ARGOTE VILLALOBOS, MARIE ROSE, AND FRANÇOIS FELIX, MAR-
QUIS DE FOUGERES, APPELLANTS, v. THE UNITED STATES.

In October, 1817, Coppinger, the Governor of Florida, issued a grant giving the
grantee permission to " build a water saw-mill on the creek of the River St. John's
named Trout Creek, and also to make use of the pine-trees which are comprehend-
ed in a square of five miles, which is granted to him," &c.
The deputy surveyor surveyed 16,000 acres of land in three different tracts, the
nearest of which to Trout Creek was thirty miles off; and this change of location
. never received the sanction of the Governor.
The decisions of this court have uniformly been, that the survey must be in reason-
able conformity to the grant, whereas the one in question is not.
The surveyor-general had no authority to change the location of the grant, and split
up the surveys, as there was no authority in the grant to go elsewhere in case·
there should be a deficiency of vacant land at the place indicated by the grant.
The lands on Trout Creek were poor, and those which were surveyed were of the

best quality. The surveys, therefore, have neither merit in fact, nor the sanction of law to uphold them.

THIS was an appeal from the Superior Court of East Florida. . It was argued at the December term, 1847, and dismissed for want of jurisdiction, and is reported in 6 Howard, 81. It was afterwards reinstated on the docket of this court by act of Congress, approved 20th July, 1848.

The appellants, who were the petitioners in the court below, on the 28th day of May, 1829, filed their petition in the Superior Court for the Eastern District of Florida, under the act of Congress dated the 28th of May, 1828, which gave authority to that court to adjudicate claims to land embraced by the treaty of the 22d of February, 1819, between the United States and Spain.

The petition set forth, that, on the 29th day of October, 1817, a grant for 16,000 acres of land was made by the Spanish Governor, Coppinger, to José Argote Villalobos, for the purpose of erecting thereon a water saw-mill; that the location thereof was to be on Trout Creek, in the Province of East Florida; but not being able to find an eligible situation for said mill and a sufficient quantity of land ungranted on Trout Creek, the Surveyor-General, George J. F. Clarke, in virtue of the power with which he was invested by the Spanish government, located and surveyed 6,000 acres of said grant on Black Creek, within the same district; also 6,000 acres on Indian River, and the remaining 4,000 acres in Alachua. The petition further sets forth, that one moiety of the two tracts of 6,000 acres was, on the 14th day of March, 1821, conveyed to the Marquis de Fougeres, one of the petitioners, and that a water saw-mill was built by the petitioners on the tract located on Black Creek; that the said claim for the two tracts of land was presented to the Board of Land Commissioners for East Florida, who reported unfavorably to the petitioners, on the 12th of December, 1827, though not on the ground that said grant was either ante-dated or forged.

The attorney for the United States, without admitting any of the facts stated in the petition, and calling for proof thereof, averred in his answer to the petition, that, if any such grant had been made by the Spanish authorities during the administration of Governor Coppinger, it was made contrary to the laws, ordinances, and royal regulations of the government of Spain, then in force in said Province of East Florida, and that it was never approved by the king of Spain. That no power was ever conferred on said Governor Coppinger to make grants of the magnitude and description of the one set forth in the petition. That, if said grant were otherwise valid, it gave no right to locate on other lands than those at Trout Creek. That the

tract on Indian River was more than one hundred miles distant from Black Creek, where the mill, if built at all, was erected ; and that neither of said tracts was vacant land, but they were in possession of the Seminole Indians. That at the time of the alleged grant Villalobos was a Spaniard, and under the laws of Spain could not locate said lands in prejudice of the rights of the Indians. That said grant, if made at all, was made since the 24th day of January 1818, and is void by the eighth article of the treaty. That the sale to the Marquis de Fougeres was void, and that the petitioners have forfeited all right to said land, if any they had, by failure to improve and cultivate, or perform the conditions of said grant.

There was subsequently an amended answer, setting forth certain reports made by the " Señor Auditor of War," relative to grants and concessions of land made upon condition of the establishment of factories, saw-mills, &c., which had not been complied with, and recommending the term of six months from that date as the time limited for the performance of such condition ; and that grants upon condition unperformed after that time should be null and void. Which report was averred to have been confirmed by Governor Coppinger. And it was averred that the petitioners had not brought themselves within such limit.

There was a general replication.

The memorial and decree were as follows : —

### Memorial.

" Señor Governor : — Don José Argote Villalobos, with great respect, presents himself to your Excellency, and says, that he has fixed his intentions to establish a mill for sawing timber on a creek of the River St. John's, named Trout Creek, which affords a site fit for the purpose ; and as such an undertaking promises great advantages to the royal revenue in the exportation of this product of the Province, and also the supply of the timber necessary for the inhabitants, he supplicates your Excellency to be pleased to grant him your superior permission that he may accomplish the said mill, with a corresponding right to five square miles of land, or an equivalent for a competent supply of timber, a favor which he hopes to obtain from the goodness of your Excellency.

" José Argote Villalobos.

. "*River St. Mary's, 27th October*, 1817."

### Decree.

" *St. Augustine of Florida, 29th October*, 1817.
" Taking into consideration the benefit and utility which

would result to the Province in its improvement, if what Don José Argote Villalobos proposes should be accomplished, it is granted to him, without prejudice to a third person, that he may build a water saw-mill on the creek of the River St. John's, named Trout Creek; and also to make use of the pine-trees which are comprehended in a square of five miles, which is granted to him, which advantage he shall enjoy for the said water saw-mill without any other person having the right to diminish it in any respect. And for his security, let the corresponding certificate be despatched to him from the secretary's office.

COPPINGER."

" Don Thomas De Aguilar, Sub-Lieutenant of Infantry, and Secretary of this Government for his Majesty.

" I certify that the foregoing copy is faithfully taken from the original, which exists in the secretary's office in my charge, and in obedience to orders, I give these presents in St. Augustine of Florida, the 29th of October, 1817.

" THOMAS DE AGUILAR."

The act of sale by Villalobos to the Marquis de Fougeres was as follows : —

### *Protocol.*

" In the city of St. Augustine of Florida, on the 12th of May, 1821, I, the subscribed notary of the government, in virtue of the disposition made by his Excellency, Don José Coppinger, colonel of the national armies, military governor, and civil authority of this place, and of the province thereof, by a decree of the 10th instant, issued at the instance presented by Marquis de Fougeres, consul of his most Christian Majesty in Charleston, and resident of this place, do proceed to register, in continuation of said instance, the document annexed to it, and it is a contract entered into under date of the 15th of March last, between the said Marquis and Don José Argote Villalobos, relating to the sale and transfer, which the second part has made in favor of the first part, of one moiety of a tract of land, comprehending six thousand acres on the Indian River, and another moiety of another tract of equal extent, in the place called Black Creek, which tracts are part of a square of five miles, which this government granted to the said Villalobos on the 29th of October, 1817; the said document containing divers articles of agreement between both parties.

" In testimony thereof, and of the said contract been registered, translated in the Spanish language by Don Bernardo Sequi, appointed by the tribunal for the purpose, in the pres-

ence of Don Pedro Miranda, Don Francisco José Fatio, and Don Domingo Reyes, witnesses.

"JUAN DE ENTRALGO,
*Notary of the Government.*

*Translation.*

" South Carolina :

" Be it known by these presents, that we, José Argote Villalobos on one part, and Marie Rose, François Felix, Marquis de Fougeres on the other part, have entered into the following agreement: Whereas, the said José possesses two tracts of land in East Florida, which tracts are part of a grant of a square of five miles, comprehending sixteen thousand acres, granted to him, the said José, by the Spanish government, on the 29th of October, 1817, as it is registered at large in the office of said government in the said East Florida, the condition of the grant being that the said José shall erect, or cause to be erected, on the tract, a water saw-mill; and whereas a parcel of said grant, comprehending six thousand acres, is situated on Indian River, in the said East Florida, and another parcel, also containing six thousand acres, is situated on Black Creek, the said José has agreed to transfer one half, or an equal part of each of the two parcels aforesaid, to the said Marquis de Fougeres, his heirs and assigns, under the terms and conditions which shall be expressed in continuation.

" Now this contract witnesseth, that the said José, in virtue of the conditions and motives which will be mentioned, sells and transfers to the said Marquis, his heirs and assigns, one half of the six thousand acres situated on Indian River, which half will be settled and indicated by a line drawn from the point on said river which divides the tract into two parts, running parallel with the boundaries which divide it from the lands of Juan H. McIntosh, and terminating at the extremity of the pine land corresponding to the said tract, as it is shown more at large in the plot thereof hereunto annexed, which parallel line will divide the said tract into two equal parts, and that part shall belong to the said Marquis which is bounded by the lands of the said McIntosh; and if at any time the Marquis would wish, within two years from this date, to sell his share of the said tract, he shall give previous notice thereof to the said José, his agent or attorney, who, or any of them, shall be entitled to the preference in regard to the mentioned share, on paying the same price which might be offered by any other person, if it were their wish to purchase; and in the same case will be placed José with respect to the Marquis, his agent or attorney, if the said José should think proper to dispose of

46 *

his moiety. At the same time, the said José agrees to sell and transfer to the said Marquis, his heirs and assigns, one half, or an equal part, of six thousand acres of land mentioned above, situated on Black Creek in the said East Florida, which tract will be divided by the contracting parties themselves, and the division will not be made until the construction of a water saw-mill be made and erected on the said place; and neither of the said contracting parties, without their mutual consent, will have the faculty to sell, alienate, or in any manner dispose of any part of the said tract, until after the division takes place. It is likewise agreed, that the parties will give to each other notice of their intention to sell; each of them having in themselves, or in their attorneys, the same right and privilege which has been specified in regard to the Indian River tract. And the said Marquis, in consideration of the said sale and transfer made by said Jose, obligates himself to construct and erect, at his own charge and expense, on the said Black Creek, all its necessary machinery, dams and houses, which ought to be built in such a manner that the conditions of the grant be fulfilled; and for the intent and purpose of this agreement, the works for the said mill shall have to be commenced on or before the 20th day of next April, the Marquis supplying all the means and funds necessary to obtain its perfection, in order that it may be in operation and in activity as soon as possible. The mill being completely finished will be considered as the common property of both parties in an equal share; consequently they shall be equally subject to all the expenses, repairs, and management which may take place, and they will equally participate in the profits.

" And the said Marquis also obligates himself to pay to the said José the sum of one dollar, before the execution and delivery of this instrument, and he obligates himself also, that in case he should fail in any manner to fulfil the conditions of this agreement, to pay, himself, or through his assigns or attorney, by way of penalty, to the said José, his heirs and assigns, the sum of one thousand dollars, recoverable before any tribunal; it being understood, nevertheless, that the said Marquis will be in no wise responsible, in case of prohibitions or impediments preventing him to fulfil his said engagements, if said prohibitions or impediments proceed from the Indians of that territory, or from the Spanish or American laws or governments, or if impeded by any other cause not originating in himself; but in case the said work be not carried into effect, for default or negligence of the said Marquis, or in case of his demise before the said mill is commenced, then said Jose, or his assigns, will no longer be subjected to this transfer

or agreement, which will remain null and void. And the said José likewise obligates himself, his heirs, executors, and assigns, at any time, that is to say, after the construction of the said mill in the terms and manner specified, to execute or cause to be executed, in favor of the Marquis, his heirs and assigns, the corresponding title and transfer of the two mentioned parcels of land, in conformity to the present or future laws and regulations of the Territory of Florida.

"In testimony whereof, the two mentioned parties respectively sign and seal the present, this day, the 15th of March of the year of our Lord 1821.

"José Argote Villalobos. [seal.]
Marquis de Fougeres.     [seal.]

" Witness :— Boudoin.
   Thomas Leager."

### Petition.

" His Excellency the Governor :— I, the Marquis de Fougeres, consul of his most Christian Majesty in Charleston, with due respect, state to your Excellency, that, for the purposes and effects which may be convenient to me, I have to solicit from the justice of your Excellency, that you may be pleased to order the protocol of the English document annexed, and the translation thereof, which document is an agreement which I have entered into with Don José Argote Villalobos, under date of the 15th of March last past, relative to the sale and transfer, which he has executed to me, of one half of a parcel of land, containing six thousand acres of land situated on Indian River, and another half of another parcel of the same extent on Black Creek; which parcels are part of a square of five miles, which was granted by this government to the said Villalobos, on the 29th day of October, 1817. Therefore, I supplicate your Excellency to be pleased to provide, as I have at first solicited, and that afterwards such certified copies as I may want be given me, whic' favor I hope to receive from the justice of your Excellency.

" St. Augustine, on the 10th of May, 1821.

" As the party solicits.

" Coppinger.
Juan de Entralgo,
   *Notary of the Government.*

" In St. Augustine, on the same day, month, and year, I notified the preceding decree to the Marquis de Fougeres, which I certify.

" Entralgo.

" It is conformable to the originals thereof, which remain in the archives under my charge, to which I refer, and in obedience to superior order, and at the request of the party, I sign and seal the present certificate, in six leaves of common paper, as stamps are not used.

" St. Augustine of Florida, on the 14th of May, 1821.

"JUAN DE ENTRALGO,<br>*Notary of the Government.*"

The record contained certificates of survey by George F. Clarke, accompanied with plats, one of which was as follows : —

" Don George Clarke, Lieutenant of the Militia of St. Augustine of Florida, Captain of the District of St. Mary's, and Surveyor-General of the Province, by appointment of the Government.

" I certify that I have measured and marked the boundaries for Don José Argote, of six thousand acres of land on the south branch of the creek named Black Creek, which discharges itself into the River St. John's, on the west side, in part of a larger quantity which was granted to him by the government for the construction of a mill to saw timber, which land agrees in its local circumstances with the annexed plat, and its copy kept in the book of surveys in my charge. District of St. Mary's, the 1st December, 1817.

" G. J. F. CLARKE."

The others were of the same tenor.

There was evidence that a saw-mill was built by Fougeres on Black Creek in 1822 or 1823, and Clarke, the surveyor, testified that he had always acted upon the rule, when requested, of changing the location of grants, and that it was the practice of his predecessor.

There was a large mass of documents in the record, consisting of grants, decrees, certificates of surveys relating to other land and other persons than those concerned in this case, and which were introduced for the purpose of showing the practice of departing from the calls of the concession in certain cases. There was evidence that the land on Trout Creek was poor, whilst the tracts surveyed in lieu thereof were of the best quality. It was in proof that Black Creek was some thirty miles from Trout Creek, and Indian Creek about one hundred miles from Black Creek, and still further from Trout Creek, and the survey in Alachua still more remote.

The court decreed that the claim of the petitioners was not valid, and that it be rejected, from which decree this appeal was taken.

The cause was argued by *Mr. Yulee* and *Mr. Berrien*, for the appellants, and by *Mr. Crittenden*, Attorney-General, for the appellees.

*Mr. Yulee*, for appellants.

This was not strictly what is known as a mill-grant, but was absolute and without condition. In all cases of mill-grants, strictly so called, there was an express and distinct condition, without a compliance with which the grant was to be void. Such was the case of Percheman, and also of Sibbald. It will be found in all cases that have come before the court, that an express condition was contained in the grant itself. In this case it was not so. The grant in this case is equally strong with that in the case of Arredondo. The words are simple, " I grant;" " *concedo*." U. States *v.* Richard, 8 Pet. 470 ; U. States *v.* Kingsley, 12 Pet. 476; U. States *v.* Drummond, 13 Pet. 84 ; U. States *v.* Burgevin, 13 Pet. 85 ; U. States *v.* Breward, 16 Pet. 143; U. States *v.* Low, 16 Pet. 162 ; U. States *v.* Sibbald, 10 Pet. 313 ; U. States *v.* Seton, 10 Pet. 309.

There being no condition in the grant itself, the only other condition that can be made is that created by some law or ordinance of Spain. But this court has decided that no condition can be implied, in the case of the United States *v.* Hanson, 16 Pet. 199. The Governor had absolute power to make grants in absolute terms. and so this court has held.

But if there is any condition to be implied, it must be subsequent and not precedent, as in the case of Arredondo. The grant was of a present title, and could only be defeated by proceedings instituted for that purpose, if it was a condition subsequent.

In the Arredondo case, the court announced its intention to treat liberally all the rights protected by the eighth article of the treaty with Spain. Now the court will construe more strictly a grant with condition as against the United States, and more liberally as respects the grantor, because the condition tends to defeat an estate already vested and in use.

The eighth article of the treaty refers to those grants as annulled which had a condition limited in its terms within a certain time in which it was to be performed.

But in this case a mill was built, and therefore it is immaterial whether there was a condition precedent or subsequent. Sibbald's and Kingsley's cases. It is said that the mill was not built on the spot required by the grant. In reply it may be said, that the grant did not require any mill to be built, but that was regulated in a separate clause. But the site of the mill, as laid down in the grant, was occupied, and therefore it

was built on Trout Creek. It was, however, a compliance with the policy of Spain that the mill should be built anywhere. Although a legal compliance with the condition could not be performed, a compliance *cy pres* is sufficient. Sibbald's case; U. States *v.* Arredondo, 6 Pet. 691.

The rule of the common law is not the same as the rule of the civil law in the construction of grants. Under the civil law, they are construed liberally rather than strictly. Domat, page 13, introductory chapter; also, page 39, section 12.

As to surveys. The grant is assumed to be at Trout Creek, and the survey was not. This case is parallel to that of Sibbald. The petition in this case is for five miles square of land, or an equivalent (should be *its* equivalent; see *equivalente*).

In Sibbald's case the petition is for a square of five miles, or its equivalent. The grant was for the land, without any reference to the equivalent. And the court say, " The treaty grant conferred lands to those in possession of them, and of course the confirmation refers to lands of which they were then in possession."

The practice was to hange the location of grants when necessary, and such changes were always recognized by the Spanish governors, provided the quantity were conformed to. This is the testimony of the Surveyor-General.

(*Mr. Yulee* referred to several instances in which changes of location were confirmed.)

This, according to the rule laid down by the court in the Arredondo case, is a legislative ratification of the principles on which the reports were founded.

At any rate, it is a custom. It is not under the Spanish, as in the common law, that universal usage is required. Ten years are enough. White, p. 360.

It is to be presumed that the Surveyor-General did not exceed his powers.

There was not vacant land enough at Trout Creek for the location of the five miles square. In Sibbald's case, the location was to be made at Little Trout Creek, and the court sanctioned the change of location.

The brief of the Attorney-General imputes fraud.

The survey was made before 1818, before any negotiations were opened for the transfer of the country.

Again, the party immediately proceeded to build the mill, which they would not have hazarded if there had been fraud in the grant.

Again, it is presumed that the Governor acted in good faith. Yet the parties went boldly to him to state all that had been done.

Also, the continued practice shows there was no fraud.

*Mr. Crittenden, contra.*

The grant shall always suppose defined the thing granted. Now in this case the grant is for five miles square on Trout Creek. But it is attempted to get rid of the precision of this grant by referring to the petition. In Sibbald's case there is a reference in the grant to the petition, and it becomes a part of the grant. Here there is no such reference. There the petitioner asked for two and a half miles square or its equivalent, and the grant was according to the petition. In this case he asked for the same, but the grant gives him the right to five miles on Trout Creek. The petitioners have not so located it. They have proved that this is very poor land, and they have searched about for other land, and the nearest that they have hit upon is thirty miles distant.

The title here is derived from the surveyor rather than from the Governor. The instructions to the surveyor directed him to make the survey according to the grant. If he made it differently, it was then a grant from the surveyor. It is said that such had been the practice, and an instance is cited where a survey had been made differently from the grant and afterwards confirmed by the Governor. This was a new grant. It proves nothing more than the liberality of the Governor.

This survey was just one month before the time after which all these grants are condemned.

Mr. Clarke, the surveyor, being called as a witness, stated that he did not make the survey, nor know who did.

But the ground I rely on is, that the surveyor had no authority to make this new grant. I do not question the power of the prince to make a grant of land surveyed differently from the original grant. But is any thing of the kind shown here? On the contrary, the papers in this case show a direction to survey a particular grant, in a particular place, and the surveyor makes it in another place and another manner; and no subsequent grant of these surveyed premises is shown. It rests, therefore, entirely in the action of the surveyor. By the same right that the surveyor changed the location, could he not have changed the quantity?

It is said that Spanish law makes ten years a custom; and the doctrine of the other side is, that any officer who should adopt any practice, and should continue it for ten years, however great the malfeasance or misfeasance, still, if he can succeed in continuing it for ten years, it stands up at the end of that time in all the purity of legitimacy and law. But such is not the practice under the Spanish law. It must be done in good faith.

*Mr. Crittenden* cited U. States *v.* Hanson, 16 Pet. 201; U.

States *v.* Seton, 10 Pet. 311; U. States *v.* Forbes, 15 Pet. 182; U. States *v.* Breward, 16 Pet. 146; U. States *v.* Kinsley, 12 Pet. 485, 486; U. States *v.* Mills's Heirs, Ib. 215; U. States *v.* Burgevin, 13 Pet. 86; U. States *v.* Wiggins, 14 Pet. 351; U. States *v.* Delespine, 15 Pet. 333; White's Recopilacion, 250–258.

*Mr. Berrien,* in reply.

1. The petition and decree gave a valid title to 16,000 acres of land, without reference to location; It was inchoate in one sense, that petitioners might, on application to the Spanish government, if it had continued, have obtained a perfect title; but it gave a right of property, protected by the treaty, and recognized by this court. It is then equal to an absolute title. Delassus *v.* U. States, 9 Pet. 117, 132. See the Treaty of 1819, more express than that of 1803.

2. The transfer of a moiety to Fougeres, under the sanction of Governor Coppinger, vested that moiety in him, and was a recognition of the title. This was conformable to the usages of the Province. Mitchel *v.* U. States, 9 Pet. 741. The treaty only restricts the power of the Governor in making grants after the 24th of January, 1818. All his other powers remain intact. This location was after the 24th of January, 1818, and this court has decided that he could not change a location after that date, because that would be to make a new grant. But the Governor could recognize a transfer of an already existing grant. He could make a decree allowing a sale, as in the case of Fougeres. He could decide a question of *meum* and *tuum* between two Spanish subjects. Otherwise, the most serious injury would result to the Marquis de Fougeres.

3. It was a grant of the land, and not merely of the trees growing on it. U. States *v.* Richard, 8 Pet. 470; U. States *v.* Seton, 10 Pet. 309.

4. It was an absolute, unconditional grant. It is not in the form used in grants conditioned to take effect on the building of a mill. In Bethune's case the grant was " on the express condition, that he is to set up said machine within the time which I grant him." And in Kingsley's case, " but upon the express condition that, until he builds said machine, this concession will be considered as not made, and of no value nor effect, until the happening of that event." In this case the grant is without condition. It gives authority to build a mill, and it grants 16,000 acres of land, but does not require the mill to be built, nor make the one dependent on the other. The building of a mill is not a condition precedent or subsequent. The court cannot annex such a condition to the grant from the authority to build a mill (10 Pet. 306). The Governor judged

of the consideration on which he issued his grant, and, exercising like authority, could make a gratuitous concession. This court has repeatedly said, that the Governor would be presumed to have acted within the scope of his authority in making grants.

5. No specific location of the 16,000 acres was designated. The petition asked for " the right to build a mill," " and a grant of five miles square or its equivalent." The concession gives the right to build the mill at the place designated; and also the use of the pine-trees in a square of five miles, " which is granted to him," without designating any particular location. In construing the grant, the court must give effect to the words " or its equivalent." It was five miles square at Trout Creek, or its equivalent elsewhere. The authority to build a mill was limited to a particular place, Trout Creek. But the grant of the 16,000 acres of land was not so limited.

6. The mill was built in sufficient time. There was no limitation of time in the concession. Governor Coppinger had no power to alter the terms of the concession after the 24th of January, 1818. The right of the grantee was protected by the treaty, and could not be disturbed by the Spanish authorities after that time. If he had the power to limit, he must have had the correlative power to enlarge, the time, and thus in effect to make a new grant. But the grant was absolute, not on condition of building a mill. If there had been a condition unlimited as to time, the utmost that could be done would be, to require that it should be done in a reasonable time. The treaty must take effect, either from the ratification by both parties in 1821, or from the exchange of flags in 1822. The mill was commenced in the winter of 1822. A treaty, as between the contracting parties, operates from its date; but as respects individual rights, it can only take effect from the ratification by both parties. U. States v. Arredondo, 6 Peters, 748.

This court has disclaimed the power to enforce a forfeiture for a condition broken. U. States v. Sibbald, 10 Peters, 322.

7. If there was a change of location, it was warranted by the Spanish usages and customs, to which this court has always given effect. The court is to carry into effect the treaty, and to protect property protected by the treaty, whether complete or inchoate, if property by the Spanish laws and usages. What are the laws and usages? In the language of this court (6 Peters, 714), " the laws of an absolute monarchy are the will and pleasure of the monarch, expressed in any way," &c. We are not swearing away the law, as the Attorney-General supposes, by the introduction of evidence of usages and customs; but by showing what the usages and customs were, we

show what the law was. This court has said, that, in the examination of these claims, it will look into the Spanish customs and usage. The question here is, What was the usage of the Spanish executive officer, in regard to the acts of his subordinates?

Mr. Justice CATRON delivered the opinion of the court.

In October, 1817, Coppinger, Governor of Florida, was applied to by Villalobos for leave to build a saw-mill on Trout Creek, at a proper site for a mill there existing; with a corresponding right to five miles square of land, or an equivalent, for a competent supply of timber; on which application the Governor decreed as follows : —

· " Taking into consideration the benefit and utility which would result to the Province in its improvement, if what Don José Argote Villalobos proposes should be accomplished, it is granted to him, without prejudice to a third person, that he may build a water saw-mill on the creek of the River St. John's, named Trout Creek; and also to make use of the pine-trees which are comprehended in a square of five miles, which is granted to him, which advantage he shall enjoy for the said water saw-mill, without any other person having the right to diminish it in any respect. · And for his security, let the corresponding certificate be despatched to him from the secretary's office."

1. No mill was built on Trout Creek, nor any attempt made to do so; but sixteen thousand acres of land were surveyed for Villalobos by some deputy surveyor of the Surveyor-General, George F. Clarke, and certified by the latter, in three separate parcels; one on Black Creek, for six thousand acres; one on Indian River, for six thousand acres; and the third in Alachua, for four thousand acres. The nearest of said surveys to Trout Creek is about thirty miles off, and the farthest is more than one hundred miles distant. The lands as surveyed are claimed by Villalobos and the Marquis de Fougeres, to whom Villalobos conveyed a moiety of his claim in March, 1821. This latter survey lies within territory then held by the Seminole Indians. A mill was built by the Marquis on Black Creek, on the survey there made for six thousand acres, say in 1822 and 1823. Whether the surveys were regularly returned to the office of the public archives, or to the government secretary's office, does not appear; there is no evidence that they were returned to either by the Surveyor-General, the proof being, that they were filed in the office of the public archives as part of the evidences of claims that had been submitted to the register and receiver when acting as commissioners on Florida claims.

One thing, however, is certain, that the change of location never received any direct sanction from the Governor of the Spanish province during the time his powers existed to act in the matter. On this state of facts, the question is, whether the Surveyor-General had any authority to make the change, and thereby bind the Spanish government to complete the title; if he had such power, then the American government is equally bound.

By the eighth article of the treaty of 1819 it is stipulated, that " all grants of land made before the 24th day of January, 1818, by his Catholic Majesty, or by his lawful authorities, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same would be valid if the territories had remained under the dominion of his Catholic Majesty."

This court has uniformly held, that where the land was granted by a concession, and a survey had been made of it by the Surveyor-General, in reasonable conformity to the grant, before the 24th of January, 1818, that such survey should be recognized as valid, and deemed to have severed the land from the public domain.

That the surveys made for Villalobos were not in reasonable conformity to the grant made for 16,000 acres on Trout Creek, is not assumed on part of the claimants; they rest their right to a confirmation for the three tracts surveyed on the ground, that the Surveyor-General had power, by force of the grant, to change the location, and to locate the land granted in as many parcels as he saw proper to designate. To show the existence of this power in the Surveyor-General, he was examined as a witness in the present controversy, and proved that he had, in various instances, made similar changes, and that none of them had been rejected, or objected to, by the Spanish governors. Antonio Alvarez, the keeper of the archives, was also examined on this point; he testifies, that there exist in the archives a few instances where changes of location had been made by the Surveyor-General without an order of the Governor for the change; but this was done under peculiar circumstances, as where the land granted had been taken by a previous concession.

From the long experience this court has had in the investigation of Spanish titles, as claimed in Florida, as well as from the practice in regard to which the witnesses depose, we are of opinion, that the Surveyor-General had no authority to change the location of the grant, and to split up the surveys, as was done in this instance. The question has been settled by this court in the cases of United States *v.* Huertas (9 Peters,

171) and United States v. Levy (13 Peters, 83). The surveys in this instance abandoned the grant; no aid is asked from it, but the sole act of the Surveyor-General is relied on for a decree completing the title, and, if confirmed by us, must be sanctioned as the origin of Villalobos's title; and that no such power can be exercised by this court was held in the case of Forbes (15 Peters, 172).

The grant was for a tract comprehended in a square of five miles; and although an equivalent was solicited, none was granted except in case vacant land enough could not be found at Trout Creek to satisfy the grant in one body, and a square form; nor is there any evidence that such deficiency existed.

It is proved that the lands on Trout Creek are poor, and of little or no value, and that those surveyed are of the best quality known in Florida; and manifestly, that the change of survey had in view the acquisition of valuable lands for the purposes of speculation, and not to secure pine-trees, out of which to saw lumber; so that these surveys have neither merit in fact nor the sanction of law to uphold them.

2. As the want of a survey does not defeat the grant, as this court held in the cases of Arredondo (13 Peters, 133) and of Buyck (15 Peters, 224), the next and remaining question is, whether the grant itself can be located. For although the petition proceeds on the surveys, yet this court having the case before it as on bill in chancery, we would be disinclined to bar the claim on a technical ground. If it had merits, and these could not be reached on the pleadings as they stand, the court on hearing could order amendments, so that the merits could be reached; and to this end the cause could be remanded to the court below; nor do we apprehend even this to be necessary in a case like the present.

The surveys being rejected, the grant may be resorted to, and a survey ordered, if the land granted can be identified. It is therefore necessary to examine the claim on the face of the grant. For a description of the place where the land was solicited, and which is adopted by the Governor's decree, we must look to the memorial of Villalobos. He says, " that he has fixed his intentions to establish a mill for sawing timber, on a creek of the River St. John's named Trout Creek, which affords a site fit for the purpose "; and he supplicates the Governor to grant permission to build the mill at that place, with a corresponding right to five miles square of land for a competent supply of timber.

The grant refers to no one part of Trout Creek more than another, at which the site for the mill is, and where the land

should be surveyed; there is no identity of place, nor a possibility to locate the grant by survey. No claim has ever been before this court that is more vague.

In cases of a vague description, this court has uniformly held that no particular land was severed from the public domain by the grant, and that no survey could be ordered by the courts of justice. Buyck *v,* U. States, 15 Peters, 224; U. States *v.* Delespine, 15 Peters, 333; U. States *v.* Miranda, 16 Peters, 156, 157.

On all the grounds presented, we are of opinion that the court below decided correctly in rejecting this claim; and it is therefore ordered, that the decree of the District Court be affirmed.

### *Order.*

This cause came on to be heard on the transcript of the record from the Superior Court for the District of East Florida, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Superior Court in this cause be, and the same is hereby, affirmed.