RISS & COMPANY, Inc., Plaintiff,

v.

ASSOCIATION OF AMERICAN RAIL-
ROADS et al., Defendants.

Civ. A. No. 4056–54.

United States District Court
District of Columbia.

Nov. 3, 1959.

See also 24 F.R.D. **7.**

A. Alvis Layne, Jr., Lester M. Bridgeman, Robert L. Wright, Morton A. Brody, Washington, D. C., for plaintiff, Riss & Co., Inc.

William E. Miller, Stephen Ailes, Richard A. Whiting, Washington, D. C., for defendant Association of American Railroads.

Hugh B. Cox, James H. McGlothlin, Washington, D. C., for defendants Baltimore & O. R. Co. and others.

Francis M. Shea, Lawrence J. Latto, Washington, D. C., for defendants Atlantic Coast Line R. Co. and others.

Stuart S. Ball, Richard J. Flynn, Chicago, Ill., for defendants Atchison, T. & S. F. R. Co. and others.

Martin A. Meyer, Jr., Washington, D. C., for defendant Virginian Ry. Co.

Edward K. Wheeler, Robert G. Seaks, Washington, D. C., for defendants Chesapeake & O. Ry. Co. and New York Cent. R. Co.

H. Graham Morison, Newell A. Clapp, Washington, D. C., for defendant Louisville & N. R. Co.

John D. Lane, Fred S. Gilbert, Jr., Washington, D. C., for defendants Boston & Maine R. R. and New York, N. H. & H. R. Co.

J. Raymond Hoover, Washington, D. C., for defendants Grand Trunk Western R. Co. and Central Ry., Inc.

SIRICA, District Judge.

Plaintiff has moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A., to dismiss certain "common law" counterclaims of defendants on the ground that these counterclaims do not state a claim upon which relief can be granted, and that this Court lacks jurisdiction of the subject matter.

Sixteen of the remaining individual railroad defendants in this civil antitrust suit have filed counterclaims against plaintiff, Riss & Company, Inc., alleging violations of certain federal and state laws and regulations relating to motor carriers. [Plaintiff's original complaint in this action, filed in 1954, alleged that beginning in or about 1950, defendants, most of whom are railroad companies, had agreed and conspired in unreasonable restraint of trade and commerce to injure or destroy plaintiff's business and to acquire a monopoly of land transportation of property in the United States in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1, 2). (For a detailed statement of the background of this complex case see the opinion of this Court in Riss & Company, Inc. v. Association of American Railroads, D.C.D.C.1959, 170 F.Supp. 354.)] These counterclaims, filed in 1954, fall into three categories. The first category, filed by all sixteen railroads, alleges in substance that plaintiff transported freight to and from points not covered by certificates of convenience and necessity issued by the Interstate Commerce Commission and that plaintiff aided and abetted other motor carriers in performing transportation service which had not been authorized by the Commission under the authority of the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.). (See Appendix A of this opinion for paragraphs 6–11 of counterclaims of defendant (66), The Pennsylvania Railroad Company, which are substantially the same as the counterclaims of this type filed by all counterclaiming defendants.) Defendants allege that as a result of such unlawful operation by plaintiff, defendant railroads were deprived of freight transportation business which they would have obtained but for the il-

legal operation of plaintiff. The counterclaims request damages for profits and revenues alleged to have been lost by the railroads.

The Western railroads have also filed counterclaims similar to those of the Eastern Railroads mentioned above, and have filed additional counterclaims (not filed by the Eastern railroads) falling into a second distinct category. These additional counterclaims allege that plaintiff violated federal and state laws and regulations prescribing the maximum weight of loaded vehicles, the maximum length of equipment, the speed at which motor vehicles may be driven, the traffic rules which motor vehicles must obey, the safety appliances which must be provided, the length of time which drivers may continue to operate vehicles or remain on duty, and the length of time which operators may drive vehicles without rest. The Western railroads allege that as a result of such operations, plaintiff was able to advance its competitive position by delivering freight faster than the railroads, thus obtaining business which the railroads would otherwise have received. (See Appendix B of this opinion for paragraphs 19 and 20 of the counterclaims of defendant (40), The Missouri-Kansas-Texas Railroad Company, which are substantially the same as the counterclaims of this type filed by the other Western railroads).

In the third category of counterclaims, defendant Western railroads further allege that they have suffered competitive injury as a result of plaintiff's unlawful control of another certified carrier in violation of Section 5(4) of the Interstate Commerce Act (49 U.S.C.A. § 5 (4)). (See Appendix C for paragraphs 17 and 18 of the counterclaims of Western defendant (40), The Missouri-Kansas-Texas Railroad Company, which is substantially the same as the counterclaims of this type filed by the other Western railroads.)

Plaintiff moved to dismiss these counterclaims in January, 1955. All parties filed extensive briefs on the subject and argument on the motion to dismiss was heard by Judge Schweinhaut on October 31 and November 1, 1955. In October, 1956, Judge Schweinhaut entered an order denying plaintiff's motion to dismiss without prejudice to its renewal at pretrial. Plaintiff's present motion for judgment on the pleadings is filed under the terms of Judge Schweinhaut's order of 1956 and is based in part on two recent decisions, Consolidated Freightways, Inc. v. United Truck Lines, Inc., Or.1958, 330 P.2d 522, certiorari denied, 1959, 359 U.S. 1001, 79 S.Ct. 1136, 3 L.Ed.2d 1029; and T.I.M.E. Incorporated v. United States, 1959, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952.

Before proceeding to a consideration of the basic issue before the Court, the counterclaims of the Western railroads alleging injury as a result of plaintiff's violation of federal and state highway and safety regulations (see Appendix B of this opinion) will be discussed.

The Western railroads, in their additional counterclaims, allege that as a result of these violations, plaintiff obtained a competitive advantage in the apparent rapidity of its service and the amount of excess traffic handled, thus deriving business which the Western defendants would otherwise have obtained. To sustain their contention, the Western defendants cite a number of cases which illustrate the general rule that actions in violation of a criminal statute may be enjoined when they threaten or are causing irreparable harm to a competing business. See, e. g., Wichita Transp. Co. v. Peoples Taxicab Co., 1934, 140 Kan. 40, 34 P.2d 550, 552, 94 A.L.R. 771; New York, New Haven & Hartford R. Co. v. Deister, 1925, 253 Mass. 178, 148 N.E. 590; Northern Pac. Ry. v. Schoenfeldt, 1923, 123 Wash. 579, 213 P. 26; Princeton Power Co. v. Calloway, 1925, 99 W.Va. 157, 128 S.E. 89.

■■ The general rule of tort law is that one claiming damages for violation of a statutory duty must show that he belongs to the particular class that the statute was designed to protect and that he has suffered the particular harm that

the statute was designed to prevent. See Prosser, Torts § 34 and cases cited therein (2d ed. 1955). It would appear obvious that highway speed and sleep regulations for carriers were designed to protect the public at large from highway accidents and not to protect a competing carrier from loss of business. See, e. g., Warlich v. Miller, 3 Cir., 1944, 141 F.2d 168, 170; 49 U.S.C.A. § 304(1) (2) (3); Va.Code Ann. § 46.1–390 (1958). Defendant Western railroads have not made a showing that they fall within that class of persons intended to be protected by highway safety statutes or that those statutes were designed to protect a rail carrier against competitive injury. Further, counsel for Western roads admit the difficulty of proving damages in such a situation. See Memorandum of Defendants (8), (9), (10), et seq., September 1, 1959.

Accordingly, plaintiff's motion for judgment on the pleadings with regard to the counterclaims of defendants (8), (16), (21), (22), (23), (33), (40), (41), (70), (71), (76), (78) contained in paragraphs 19 and 20 of their answers and counterclaims to plaintiff's complaint is hereby granted, since these counterclaims fail to state a claim upon which relief may be granted.

The remaining counterclaims involved in the present motion are only some of the many counterclaims filed by defendant railroads. Other counterclaims allege violations of the antitrust laws. The present motion is not directed to the antitrust counterclaims but only to those counterclaims in which the defendants have asserted a common-law cause of action for "interference with a franchise". The contentions of the parties with regard to these common-law counterclaims, in brief, are: Defendants allege that at common law the holder of a franchise was protected from unlawful interference by a competitor who was operating without, or in excess of, a franchise; that a railroad is a franchised operation and that when a transportation competitor operates in excess of its authority, this interference is actionable

in damages. The plaintiff's argument is twofold. It contends that there were no common-law rights on the part of one interstate motor carrier to limit the extent of another such carrier's routes and operations, or to sue for damages based on regulatory violations by an interstate carrier, but that if such a common-law action ever existed, it was destroyed by the passage of the Motor Carrier Act of 1935 (49 U.S.C.A. § 301 et seq.). Plaintiff points to the legislative history of the Act and the Consolidated Freightways and T.I.M.E. cases, supra. The issue to be decided by the Court, therefore, is "if the defendants ever had a common law action in damages for competitive injury resulting from a competitor's unlawful operation in excess of his statutory authority, did this remedy survive the passage of the Motor Carrier Act of 1935?"

**I**

The contention of the defendants that a common-law right of action for damages exists in favor of the holder of a franchise for loss of profits resulting from the operation by a competitor in excess of statutory authority.

At common law, a railroad was said to be the holder of a franchise. Frost v. Corporation Commission, 1928, 278 U.S. 515, 520, 49 S.Ct. 235, 73 L.Ed. 483; People's Railroad v. Memphis Railroad, 1869, 10 Wall. 38, 77 U.S. 38, 51, 19 L.Ed. 844; McPhee & McGinnity Co. v. Union Pac. R. Co., 8 Cir., 1907, 158 F. 5, 10. Defendants cite many cases in support of their contention that an action for damages will lie when such a franchise is interfered with. However, an examination of these cases indicates that the vast majority dealt with requests for injunctive relief only and that in those few instances where damages were awarded, the situation involved competitive operations purely local in character and not approaching the vast interstate transportation of property conducted by the parties to this action. See: Town of East Hartford v. Hartford

Bridge Co., 1850, 10 How. 541, 51 U.S. 541, 13 L.Ed. 531 (bridge; ferry); Menzel Estate Co. v. City of Redding, 1918, 178 Cal. 475, 174 P. 48 (ferry); Carroll v. Campbell, 108 Mo. 550, 17 S. W. 884; 1891, 110 Mo. 557, 19 S.W. 809 (ferry); McInnis v. Pace, 1901, 78 Miss. 550, 29 So. 835 (ferry). The usual remedies for protection of property rights generally are available for the protection of franchise rights and privileges, including injunctions to prevent unlawful invasion of or interference with the enjoyment of franchise rights (23 Am.Jur. Franchises §§ 37, 39 (1939)).

An examination of a number of cases indicates that the remedy by way of a suit for injunction has been widely recognized and applied. However, defendants do not cite any case in the last fifty years in which damages were awarded for interference with a franchise operation interstate in scope. Defendants cite the case of Akers Motor Lines v. Malone Freight Lines, Inc., D.C.N.D. Ala.1950, 88 F.Supp. 654, for an implied holding that once the Interstate Commerce Commission had determined the rights of the parties under the Motor Carrier Act, damages might be available in a Federal Court against a motor carrier which operated in excess of its certificate of convenience and necessity. Again, this case involved a request for injunctive relief only. 88 F.Supp. at page 655. No case, prior to or in the twenty-four years since the passage of the Motor Carrier Act, has been cited by the defendants which held that a common-law action for damages of the kind asserted by the defendants would lie. In Consolidated Freightways v. United Truck Lines, 9 Cir., 1954, 216 F.2d 543, a non-diversity case brought under the Motor Carrier Act, the Ninth Circuit was confronted with the same lack of precedent for a common-law action for competitive injury brought under Part I of the Interstate Commerce Act. The Court said:

> " * * * appellant does not attempt to rely upon, nor does it cite, any judicial authority indicating resort to, or the application of, orthodox common law remedies against the carriers covered by Chapter I of the Interstate Commerce Act in any instance where *unfair competition* between carriers in the securing of business was the basis of a demand for relief. * * * appellant makes no such showing, and *we are persuaded that none can be made.*" 216 F.2d at page 548. (Emphasis added.)

Whether such a cause of action for the vast competitive interstate injury asserted by the defendants in this case did exist prior to the passage of the Motor Carrier Act need not be determined at this time, since the Court is convinced that in any case, such a cause of action could not and did not survive the passage of the Motor Carrier Act of 1935.

## II

Plaintiff's contention that any alleged common law action for interference with a franchise did not survive the passage of the Motor Carrier Act.

The Motor Carrier Act of 1935 (49 U.S.C.A. § 301) is Part II of the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.). Part I of that Act deals with rail carriers and Part III with water carriers.

The Motor Carrier Act established a comprehensive scheme of regulation which provided for the issuance of certificates of convenience and necessity to motor carriers engaged in interstate transportation (49 U.S.C.A. §§ 306–308). The Commission is authorized to revoke these certificates (49 U.S.C.A. § 312) and criminal penalties and statutory civil remedies were provided for unlawful operation (49 U.S.C.A. § 322). However, these civil remedies are in the nature of injunction suits brought by the United States or the Interstate Commerce Commission for violations of the Act. Private parties may only petition the Commission to take corrective action and intervene in Commission proceedings (49 U.S.C.A. § 304(c)).

In both Part I and Part III of the Act, a private remedy is provided for those injured by violations of those parts (49 U.S.C.A. § 8; 49 U.S.C.A. § 908 (b)).[1] No such private remedy is provided for in Part II relating to Motor Carriers. One reason for this omission is stated in a letter from the Legislative Committee of the Interstate Commerce Commission to the Chairman of the Senate Committee on Foreign and Interstate Commerce in connection with hearings on a proposed amendment providing for such a private remedy for violations of the Act. It states in part as follows:

"When part II of the act was enacted as the 'Motor Carrier Act, 1935', it was believed that conditions were not stabilized and that the subjection of motor carriers to liability for damages should be deferred until the difficult initial problems in connection with the new regulation of those carriers had been more clearly worked out." Hearings before Senate Committee on Interstate and Foreign Commerce on S. 1194, 80th Cong., 2d Sess. p. 12.

It was long the opinion of the Interstate Commerce Commission that certain common-law remedies existed and had not been destroyed by the Act (see: T.I.M.E. Inc. v. United States, supra, 359 U.S. at pages 483–490, 79 S.Ct. at pages 915–918, 3 L.Ed.2d 952 (dissenting opinion), Hearings before Senate Committee on Interstate and Foreign Commerce on S. 1194, 80th Cong., 2d Sess. p. 12) but any discussion of such remedies concerned only shippers' rights to collect past unreasonable rates, action for failure to furnish the common-law duty of service, action for failure to deliver goods, etc. See: Merchandise Warehouse Co. v. A.B.C. Freight For. Corp., D.C.S.D.Ind.1958, 165 F.Supp. 67; Montgomery Ward & Co. Inc. v. Northern

Pacific Terminal Co., D.C.D.Or.1953, 128 F.Supp. 475.

Defendants point to the savings clause of the original Interstate Commerce Act (49 U.S.C.A. § 22), which was incorporated by reference into the Motor Carrier Act by Section 317(b) (49 U.S.C.A. § 317(b)), to sustain their contention that the Motor Carrier Act did not destroy common law remedies but rather preserved them. Section 22 states: " * * and nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

In Consolidated Freightways v. United Truck Lines, Or.1958, 330 P.2d 522, certiorari denied, 1959, 359 U.S. 1001, 79 S.Ct. 1136, 3 L.Ed.2d 1029, a suit for damages was brought by one motor carrier against another which had operated over the plaintiff's route without a certificate to do so. The Supreme Court of Oregon, in a well reasoned opinion, examined in detail the effect of the incorporation of Section 22 into the Motor Carrier Act pointing out that Section 22 and Section 317(b), which incorporated it into the Motor Carrier Act, relate to tariff and rate matters only, stating:

" * * * Therefore it is reasonable to argue that Section 317(b) was intended to embody only the specific permissible deviations set out in Section 22. The fact that the incorporating provision in Section 317(b) refers not only to Section 22 but to Section 1(7) which also deals with specific tariff matters, adds weight to this argument." (330 P. 2d at page 527).

The theory of the plaintiff in the Oregon case was based on Section 710 of the Restatement of Torts which would make

[1]. 49 U.S.C.A. § 8 states: "In case any common carrier subject to the provisions of this chapter shall do * * * any act, matter, or thing in this chapter prohibited or declared to be unlawful, * * such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation * *." (49 U.S.C.A. § 908(b) relating to water carriers is stated in substantially the same language.)

one who engages in business in violation of a legislative enactment liable to those who are engaged in the business in conformity with the enactment, if the following conditions are satisfied: (1) That the purpose of the enactment is to protect the conforming business from such unauthorized competition, and (2) the enactment does not negative such liability. The Court found that the applicable sections of the Motor Carrier Act satisfied the first requirement and then proceeded to resolve the same issue that is before this Court; i. e., did the Act destroy the kind of common-law remedy for competitive action asserted in this case? The Oregon Court found its answer in an examination of the legislative history of the Act. After indicating that an examination of the Congressional Record and the reports of the hearings before the Congressional Committees on the various bills relating to motor carrier legislation disclosed no discussion of the scope of relief under the Act (330 P.2d at page 528), the Court proceeded to a discussion of the history and setting of the Act and found that it had precluded any private relief in the federal or state courts either by way of injunction or damages. The Court said:

"* * * Considering the history of the Act, the conditions existing at the time of its enactment, the differences in the various statutes relating to transportation, and, aided by the rule of statutory construction, expressio unius exclusio alterius, it is our opinion that the Congress intended to vest in the Interstate Commerce Commission the sole authority to enforce the provisions of the Act, precluding private relief in both federal and state courts either by way of injunction or damages." 330 P.2d at page 529.

This Court, while agreeing with the Oregon Court's excellent analysis of the Act itself and its history and setting, does not agree that the Motor Carrier Act intended to destroy *all* common-law remedies. The Motor Carrier Act has not destroyed the right to relief by filing a common-law action against a carrier for failure to render service (Montgomery Ward & Co. v. Northern Pacific Terminal Co., supra), or a common-law action of damages for failure to deliver merchandise (Merchandise Warehouse Co. v. A.B.C. Freight For. Corp., supra). It is the teaching of Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, that only those common-law actions that are *inconsistent* with uniform regulation by the Interstate Commerce Commission were destroyed by the passage of the Interstate Commerce Act. This doctrine has been recently reiterated by the Supreme Court in the case of T.I.M.E., Inc. v. United States, supra, cited by the plaintiff.

In T.I.M.E., a shipper's defense of unreasonableness against a demand for a rate repayment was held to be unavailable. The Supreme Court recognized that at common law there was an action for the repayment of rates held to be unreasonable but, noting that the Interstate Commerce Commission had not been given reparations authority under the Motor Carrier Act, found that it would be inconsistent with that Act to allow the Commission to indirectly award reparations by a finding of unreasonableness in aid of a court action for damages (359 U.S. at pages 472–475, 79 S.Ct. at pages 909–910). The United States had contended that under the doctrine of primary jurisdiction, a suit for collection of unreasonable rates could be brought in a federal court which could then stay the proceedings until the I.C.C. had made a determination of unreasonableness (359 U.S. at page 472, 79 S.Ct. at page 909). The Court held that to allow this procedure would be to indirectly allow the I.C.C. to make reparation of the rate excess, something which Congress had not allowed them to do directly (359 U.S. at page 475, 79 S.Ct. at page 910). An examination of the opinion indicates that the Court's reasoning was based in large measure on the doctrine of primary jurisdiction, the Court feeling that to allow the procedure advocated by the Gov-

ernment, in the absence of reparations authority in the I.C.C., would be "inconsistent" with the provisions of the Act. Thus it would appear that T.I.M.E. does not stand for the proposition that all common-law remedies were destroyed by the Motor Carrier Act but only those which, in accordance with the doctrine of Abilene, supra, are inconsistent with its uniform application.

■ Defendants here urge that to allow the action for interference with a franchise in the instant case is not inconsistent with the uniform application of the Motor Carrier Act, since there is no question (as in the T.I.M.E. case supra) of the necessity of referring the question of whether plaintiff acted in excess of its operating authority to the I.C.C., since such administrative determination has already been made. The Interstate Commerce Commission has held that the operations described in the counterclaims as unauthorized were in fact not covered by certificates of convenience and necessity or otherwise authorized. See Performance of Motor Common Carrier Service by Riss & Co., Inc., 48 M.C.C. 327 (1948); Riss & Co., Inc., Interpretation of Temporary Authority, 54 M.C.C. 531 (1952); Riss & Company, Inc. v. United States, D.C.W.D.Mo.1952, 117 F.Supp. 296, affirmed 1953, 346 U.S. 890, 74 S.Ct. 221, 98 L.Ed. 393. Therefore, defendants contend that since the plaintiff has already been held by the appropriate administrative agency to have operated in excess of its authority, there is no question of primary jurisdiction before the Court, and T.I.M.E., supra, is not governing. The Court agrees with counsel for defendant that administrative "expertise" considerations are not relevant in this case. However, the legislative history of the Motor Carrier Act itself was a factor which also influenced the Supreme Court in T.I.M.E., 359 U.S. at pages 475–480, 79 S.Ct. at pages 910–913). Though the fact that no statutory private remedy is provided for under the Motor Carrier Act does not of itself destroy the existence of a common-law remedy, it is relevant in determining the Congressional intent. Although the question of whether a common-law remedy survived the passage of the Act was not decided, the language of the 9th Circuit in the first Consolidated Freightways case (Consolidated Freightways v. United Truck Lines, 216 F.2d 543, supra.), is illuminating on the question of the existence of a common law remedy identical to the one asserted here. The Court said:

"It is obvious from the whole setting of the Motor Carrier Act that Congress pre-empted this field of control over the motor carrier type of Interstate Commerce. It is abundantly clear that Congress intended regulatory controls to be exercised by the Commission and not by or through individuals. There is absolutely no indication in this Act or in case law that private suits might be resorted to, to aid the Commission in its enforcement of the Act and the regulations thereunder." 216 F.2d at page 547.

This Court has examined in detail the legislative history of the Act and is convinced that the 9th Circuit was correct in its analysis. There is nothing in the extensive hearings before the Congressional Committees to indicate that either the Commission or the Congress ever contemplated that an action for vast interstate competitive injury would lie at common law when one motor carrier operated in excess of its authority. On at least two occasions, amendments to the Act were proposed which would have given a private remedy for violations of the Act. Each time the amendment was not adopted. Hearings before Senate Committee on Interstate and Foreign Commerce on S. 1194, 80th Cong., 2d Sess. pp. 1, 5, 11–12; Hearings before Senate Committee on Interstate and Foreign Commerce on S. 378, 85th Cong., 2d Sess., pp. 3, 12.

Though recognizing that no reference to the Interstate Commerce Commission is necessary in this case, the Court feels that to affirm the existence of the action asserted by the defendants in this ac-

tion would be contrary to the intent of Congress when it passed the Motor Carrier Act of 1935. To entertain this private action would detract in great measure from the uniformity which Congress sought to establish in this area. The question of competitive injury between competing carriers would depend on the common law of all the states rather than on the National Transportation Policy (54 Stat. 899 (1940)). Further, a holding that a common-law action for competitive injury lies when the Interstate Commerce Commission makes a finding of excessive operation could result in an action for damages every time the Commission determined that a carrier had violated such an I.C.C. regulation and thus lead to the multiplicity of suits which Congress sought to avoid by making the Interstate Commerce Commission the sole enforcement agency under the Act. The Interstate Commerce Commission has been given extensive regulatory power and may effectively control the relatively small number of interstate carriers subject to the Motor Carrier Act. The possibility of interference with I.C.C. policy caused by such private suits also militates against allowing this type of additional regulation.

This Court does not hold that *all* common-law remedies heretofore available at common law against motor carriers did not survive the Motor Carrier Act of 1935, but only that a counterclaim asserting a right to damages for interference with a franchise resulting from the interstate operation by a competitor in excess of its certificate of convenience and necessity does not state a claim upon which relief may be granted. Accordingly, plaintiff's motion for judgment on the pleadings with regard to the counterclaims of defendants (8), (16), (21), (22), (23), (33), (40), (41), (70), (71), (76) and (78) contained in paragraphs 12 to 16 of their answers and counterclaims to plaintiff's complaint, and the counterclaims of defendants (11), (12), (29) and (66) contained in paragraphs 6 to 11 of their answers and counterclaims to plaintiff's complaint, is hereby granted.

■ Finally, in regard to the third category of counterclaims, those filed by the Western railroads alleging that they have suffered competitive injury as a result of plaintiff's unlawful control of another certified carrier in violation of Section 5(4) of the Interstate Commerce Act (see Appendix C of this opinion), the Court holds that these counterclaims do not state a claim upon which relief may be granted. These counterclaims do not fall within the class alleged in Appendix B of this opinion, since one of the purposes of Section 5(4) was to protect free competition. However, the same considerations which applied to those counterclaims alleging injury as a result of operation in excess of authority apply to these counterclaims. Defendants cite no case in which an action for damages alleging injury as a result of a violation of Section 5(4) by a motor carrier has been brought, either under the Interstate Commerce Act or at common law. As in the case of the counterclaims alleging injury as a result of operation in excess of authority, the Court holds that to allow a common-law action for damages for violation of Section 5(4) by a Motor Carrier would be contrary to the intent of Congress.

Accordingly, plaintiff's motion for judgment on the pleadings with regard to those counterclaims of defendants (8), (16), (21), (22), (23), (33), (40), (41), (70), (71), (76) and (78), contained in paragraphs 17 and 18 of their answers and counterclaims to plaintiff's complaint, is hereby granted.

Counsel for plaintiff will submit an appropriate order in accordance with this opinion.

### Appendix "A"

Answer of the Defendant Pennsylvania Railroad Company

\*    \*    \*    \*    \*    \*

*Counterclaims*

\*    \*    \*    \*    \*    \*

6. Riss for many years has transported and continues to transport property as a common carrier by motor vehicle, including manfactured articles, and especially ammunition and explosives, in

interstate and foreign commerce between points and over routes for which it did not and does not hold authority from the Interstate Commerce Commission.

7. The illegal operations of Riss without authority granted by the Interstate Commerce Commission have included and continue to include transportation of property by motor vehicle from points on this defendant's lines to other points served by it directly or in conjunction with connecting carriers by rail, to points on defendant's lines from other points served by this defendant directly or in conjunction with connecting carriers by rail, and transportation from one point not on this defendant's lines to another point not on this defendant's lines where a logical and direct route by rail would have included transportation over this defendant's lines.

8. By such illegal operations Riss has diverted and transported property which would have been transported by this defendant but for the illegal operations of Riss. Such illegal diversions and operations thereby wrongfully deprived this defendant of the revenues it would have received for the transportation of the freight illegally transported by Riss.

9. In addition to its own illegal operations, Riss has aided and abetted other operators of motor vehicles to transport property unlawfully to the damage of this defendant, and has combined and contracted with such other operators to conduct such illegal operations. Riss for a number of years did not directly operate motor vehicles for the transportation of property, but instead unlawfully purported to authorize other persons and organizations to transport property by motor vehicle under color of the certificates issued to Riss by the Interstate Commerce Commission. Such other persons and organizations had no lawful authority to transport property by motor vehicle in competition with this defendant, but did so because Riss aided and abetted them, and pursuant to the combination and contracts with Riss.

10. The illegal operations that Riss aided and abetted, and that were conducted pursuant to the combination and contracts with Riss, included transportation of property by motor vehicle from points on this defendant's lines to other points served by it directly or in conjunction with connecting carriers by rail, to points on this defendant's lines from other points served by this defendant directly or in conjunction with connecting carriers by rail, and transportation from one point not on this defendant's lines to another point not on this defendant's lines where a logical and direct route by rail would have included transportation over this defendant's lines.

11. By aiding and abetting such illegal operations, and by combining and contracting with other persons and organizations to conduct such operations, Riss caused property to be diverted and transported by motor carrier which would have been transported by this defendant but for the illegal actions of Riss. By such illegal actions Riss caused this defendant to be wrongfully deprived of such freight traffic and wrongfully deprived of the revenues this defendant would have received for the transportation of such freight.

### Appendix "B"

Answer and Counterclaim of Defendant
The Missouri-Kansas-Texas Railroad
Company

\*     \*     \*     \*     \*     \*

*Counterclaim*

\*     \*     \*     \*     \*     \*

19. In addition to the illegal operations and conduct set forth in Paragraphs 12, 13, 15, and 17 above, Riss has for many years repeatedly transported freight in violation of federal and state laws and regulations prescribing the maximum weight of loaded vehicles, the maximum length of equipment, the speed at which motor vehicles may be driven, the traffic rules which motor vehicles must obey, the safety appliances which must be provided, the length of time in

448

which vehicles may be driven without rest, and the length of time in which drivers may continue to operate vehicles or remain on duty.

20. By the unlawful operations set forth in Paragraph 19, Riss has obtained competitive advantages in the apparent rapidity of its service, and the amount of excess traffic handled by its equipment and drivers. By these unlawful operations Riss has obtained and transported freight which would otherwise have been transported by counterclaimant. By diverting freight to its illegal operations, Riss has deprived counterclaimant of the revenues and profits it would have received from the transportation of such freight.

### Appendix "C"

Answer and Counterclaim of Defendant The Missouri-Kansas-Texas Railroad Company

\*    \*    \*    \*    \*    \*

### Counterclaim

\*    \*    \*    \*    \*    \*

17. In addition to the illegal operations and conduct set forth in Paragraphs 12, 13, and 15 above, Riss on or about December 12, 1951, entered into a transaction with Jarman Transportation Company, Incorporated (hereinafter called "Jarman") by which control or management in a common interest of Riss and Jarman was effectuated or accomplished in violation of Section 5(4) of the Interstate Commerce Act as amended, Title 49 U.S.C.A. § 5(4). Such violation of law continued on or about August 1, 1953.

18. As a result of the unlawful control of management in a common interest, set forth in Paragraph 17 above, Riss and Jarman caused property to be transported by motor vehicle by Riss which would otherwise have been transported by counterclaimant. Such illegal transportation of freight and conduct thereby deprived counterclaimant of the revenues and profits it would have received from the transportation of freight thus illegally transported.