359 U.S. 464 (1959)
T. I. M. E. INCORPORATED
v.
UNITED STATES.
No. 68.
Supreme Court of United States.
Argued January 20, 1959.
Decided May 18, 1959.[*]
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.
W. D. Benson, Jr. argued the cause and filed a brief for petitioner in No. 68.
Bryce Rea, Jr. argued the cause for petitioner in No. 96. With him on the brief was Edgar Watkins.
Morton Hollander argued the causes for the United States. With him on the brief were Solicitor General Rankin and Assistant Attorney General Doub.
*465 MR. JUSTICE HARLAN delivered the opinion of the Court.
Petitioners are interstate motor common carriers, certificated by the Interstate Commerce Commission (I. C. C.) under the Motor Carrier Act of 1935.[1] Section 217 of that Act, 49 U. S. C. § 317, requires such carriers to file their transportation charges as tariffs with the I. C. C. These tariffs remain effective until suspended or changed in accordance with specified procedures, and so long as they are effective carriers are forbidden to charge or collect any rate other than that provided in the applicable tariff.[2]
These cases present in common a single question under the Motor Carrier Act: Can a shipper of goods by a certificated motor carrier challenge in post-shipment litigation the reasonableness of the carrier's charges which were made in accordance with the tariff governing the shipment?
In No. 68, T. I. M. E. transported several shipments of scientific instruments for the United States from Oklahoma to California. One of the shipments, illustrative of all involved in this litigation, originated at Marion, Oklahoma, and was carried over the lines of petitioner and a connecting carrier to Planehaven, California. At the time, the petitioning carrier had on file with the I. C. C. a tariff relating to such shipments which specified a through rate from Marion to Planehaven of $10.74 per hundredweight. Petitioner was also subject to tariffs which provided a rate of $2.56 per hundredweight from Marion to El Paso, Texas, and of $4.35 per hundredweight from El Paso to Planehaven. The through rate thus *466 exceeded the combination rate by $3.83. T. I. M. E. charged and collected on the basis of the through rate. On postpayment audit by the General Accounting Office under § 322 of the Transportation Act of 1940, 54 Stat. 955, 49 U. S. C. § 66, that office concluded that the combination rather than the through rate was applicable to this shipment and required T. I. M. E. to refund the difference between the sum collected under the through tariff and that which would have been due under the combination tariffs. This T. I. M. E. did under protest.
Thereafter T. I. M. E. brought suit under the Tucker Act, 28 U. S. C. § 1346 (a) (2), claiming that the through tariff was applicable to the shipment and that it was thus entitled to recover the difference between the through and combination rates. The Government defended on the ground that the combination rate was applicable, and alternatively contended that if the through tariff were applicable the rate specified therein was unreasonably high insofar as it exceeded the combination rate. It asked that T. I. M. E.'s suit be stayed to permit the Government to bring a proceeding before the I. C. C. to determine the reasonableness of the through rate. The District Court in an unreported opinion held that the through rate was applicable, and that neither it nor the I. C. C. had power to pass upon the Government's contention that such rate was as to the past unreasonable. Accordingly, the District Court entered summary judgment for T. I. M. E.
The Government appealed, accepting the District Court's determination as to the applicability of the through rate, but contending that the District Court had erred in refusing to refer to the I. C. C. the issue of the reasonableness of that rate as to past shipments. The Court of Appeals reversed, holding that the Government was entitled to an I. C. C. determination upon the question of reasonableness, and that the fact that the Motor *467 Carrier Act gives the I. C. C. no power to award reparations as to admittedly governing past rates does not prevent that body from passing on the question of past reasonableness when that issue arises in litigation in the courts. 252 F. 2d 178.
In No. 96, petitioner Davidson transported four shipments of goods for the United States from Poughkeepsie, N. Y., to Bellbluff, Va., and billed the United States on the basis of concededly applicable filed tariffs. On post-payment audit the general Accounting Office concluded that a part of these charges was unreasonable and should be refunded to the United States.[3] Davidson refunded under protest the sum demanded, which amounted to $18.34, and then brought suit under the Tucker Act to recover the refund. The Government defended on the sole ground that the applicable rate had been unreasonable. The District Court, without opinion, granted Davidson summary judgment, but on the Government's appeal the judgment was reversed, the Court of Appeals holding that the Government could defend on "unreasonableness" grounds, and directing a referral to the I. C. C. of the issue as to the reasonableness of the rate in question. 104 U. S. App. D. C. 72, 259 F. 2d 802.
We granted certiorari in both cases because of the suggestion that the result reached by the Courts of Appeals *468 conflicted with this Court's decision in Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co., 341 U. S. 246, and in order to settle the questions of statutory interpretation involved.[4] 358 U. S. 810.
The courts below held that the right of the United States to resist on the ground of unreasonableness the payment of the charges incurred by it was one deriving from the common law and preserved by § 216 (j) of the Motor Carrier Act.[5] In this Court the Government, although defending this ground of decision, relies primarily on the proposition that the Motor Carrier Act itself creates a judicially enforceable right in a shipper to be free from the exaction of unreasonable charges as to past shipments even though such charges reflect applicable rates duly filed with the I. C. C. The Government concedes that whatever the source of the asserted right may be, the question of the reasonableness of past rates cannot itself be decided in the courts, but takes the position that when such question arises in court litigation it may properly be referred to the I. C. C. for decision, and the results of that adjudication used to determine the respective rights of the litigants.

I.
The contention that the Motor Carrier Act itself creates a cause of action or affords a defense with respect to the recovery of unreasonable rates on the provisions of *469 §§ 216 (b) and (d) of the Act, 49 U. S. C. §§ 316 (b), (d), which provide as to interstate motor carriers:
"(b) It shall be the duty of every [such] common carrier . . . to establish, observe, and enforce just and reasonable rates, charges, and classifications, and just and reasonable regulations and practices relating thereto . . . .
.....
"(d) All charges made for any service rendered or to be rendered by any [such] common carrier . . . shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof, is prohibited and declared to be unlawful. . . ."
The Government urges that this language imposes a statutory duty on motor carriers not to charge or collect other than "reasonable" rates, and asks us to imply a cause of action under the Motor Carrier Act for any shipper injured by violation of that duty. We cannot agree.
As this Court recognized in Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co., 341 U. S. 246, 251, language of this sort in a statute which entrusts rate regulation to an administrative agency in itself creates only a "criterion for administrative application in determining a lawful rate" rather than a "justiciable legal right." In Montana-Dakota it was held that the Federal Power Act, which like the Motor Carrier Act expressly declares unreasonable rates to be "unlawful,"[6] does not create a cause of action for the recovery of allegedly unreasonable past *470 rates. In the absence of any indication that Congress intended that despite the absence of any reparations power in the Federal Power Commission the federal courts should entertain suits for reparation of unreasonable rates, and refer to the Commission the controlling issue of past unreasonableness, the Court declined to permit the Commission to accomplish indirectly through such a proceeding that which Congress did not allow it to accomplish directly.
It is true that under Parts I and III of the Interstate Commerce Act, relating respectively to rail and water carriers, a shipper may litigate as to the reasonableness of past charges even if those charges were based on the applicable and effective filed rates. The structure and history of Part II (the Motor Carrier Act), however, lead to the conclusion that here, as in the Federal Power Act, Congress did not intend to give shippers a statutory cause of action for the recovery of allegedly unreasonable past rates, or to enable them to assert "unreasonableness" as a defense in carrier suits to recover applicable tariff rates.
The very provisions of Part I, and their counterparts in Part III, which give a right of action to shippers against carriers for damages incurred by carrier violations of the Act and provide the mechanics for the enforcement of that right are conspicuously absent in the Motor Carrier Act. Thus, whereas § 8 of Part I[7] provides that "any common carrier subject to the provisions of this chapter [who] shall do . . . any act . . . in this chapter . . . declared to be unlawful . . . shall be liable to the person or persons injured thereby for the full amount of the damages sustained . . . ," Part II has no comparable provision. Again, whereas § 9 of Part I[8] gives an injured shipper the right to sue in the I. C. C. or in the Federal District Court, *471 Part II contains no comparable provision. In addition, §§ 13 (1) and 16 of Part I[9] give a shipper claiming reparation the right to proceed in the Commission and to enforce his reparation award in the courts, and Part II contains no comparable provisions.
To hold that the Motor Carrier Act nevertheless gives shippers a right of reparation with respect to allegedly unreasonable past filed tariff rates would require a complete disregard of these significant omissions in Part II of the very provisions which establish and implement a similar right as against rail carriers in Part I. We find it impossible to impute to Congress an intention to give such a right to shippers under the Motor Carrier Act when the very sections which established that right in Part I were wholly omitted in the Motor Carrier Act.
Further, the I. C. C. itself has consistently recognized that nothing in Part II creates a statutory liability on the part of the carrier for past allegedly unreasonable filed rates. In the hearings which preceded the passage of legislation in 1949 adding to the Motor Carrier Act a statute of limitations on suits to recover amounts paid to carriers in excess of applicable filed rates, proposals were also made to amend the statute by adding to it provisions similar to those already found in §§ 8, 9, 13, and 16 of Part I. The Commission noted that the proposal "would add to the Interstate Commerce Act a number of new sections which would make common carriers by motor vehicle . . . liable for the payment of damages to persons injured by them through violations of the act. At present this liability exists only in respect of carriers subject to parts I and III . . . ."[10] The suggested changes were not adopted. And in 1957 the Commission again *472 recommended amendment of the Motor Carrier Act to provide a remedy for violation of the statute to persons injured thereby,[11] and once more the measure failed of adoption.
In light of the statute and its history, it is plain that if a shipper has a "justiciable legal right" to recover or resist past motor carrier charges alleged to have been unreasonable, it is necessary to look beyond the Motor Carrier Act for the source of that right.

II.
The Government urges that even if the Motor Carrier Act does not grant the right which is claimed here, the Act must at least be read to preserve a pre-existing common-law right of that kind. It relies on § 216 (j) of the statute, 49 U. S. C. § 316 (j), as showing a congressional intention to confirm such a right in its statement that nothing in § 216 "shall be held to extinguish any remedy or right of action not inconsistent herewith." The contention is that the common law recognized the right of a shipper by common carrier to recover exorbitant rates paid under protest,[12] and that although the doctrine of primary jurisdiction requires that the issue of whether rates which are retrospectively challenged were in fact "unreasonable" be determined by the I. C. C., the common-law right may be vindicated in a suit in the courts through referral of the issue of "unreasonableness" to the Commission.
*473 The saving clause of § 216 (j) must be read in light of the judicial decisions interpreting Part I of the Interstate Commerce Act before 1935, for the course of those decisions illuminates the significance of the striking differences which Congress saw fit to make between the provisions of Part I and those of the Motor Carrier Act. The landmark case is Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426. There a shipper sued in a state court to recover the difference between an allegedly unreasonable charge exacted from it by a rail carrier pursuant to tariffs filed by the carrier with the I. C. C. and what was claimed would have been a just and reasonable charge. One of the issues before this Court was whether any common-law right to recover an exorbitant common carrier freight charge paid under protest survived the passage of the Interstate Commerce Act. The Court held, despite the existence in Part I of a saving clause much broader in scope than that here involved,[13] that because under the statutory scheme only the I. C. C. could decide in the first instance whether any filed rate was "unreasonable" either as to the past or future, any common-law right was necessarily extinguished as "absolutely inconsistent" with recognition of the Commission's primary jurisdiction. It is important to note that this conclusion did not rest upon the fact that under Part I the I. C. C. had reparations authority with respect to unreasonable charges paid by shippers, but instead was evidently dictated by the broader conclusion that the crucial question of reasonableness could not be decided by the courts.
Since the Government concedes that under Part II, as under Part I, the issue of the unreasonableness of rates *474 cannot be adjudicated in the courts, it would seem to follow that the common-law right which the Government urges as surviving under § 216 (j) cannot in fact survive, since that clause preserves only "any remedy or right of action not inconsistent" with the statutory scheme. The Government urges, however, that there is nothing actually inconsistent with the Commission's primary jurisdiction in recognizing the survival of a common-law right, because the demands of primary jurisdiction can be satisfied by referral of the question of the reasonableness of the assailed rate to the I. C. C., and that although the Commission concededly has no independent authority to entertain and adjudicate a claim for reparations, it nevertheless should be permitted in effect to exercise such an authority as an adjunct to a judicial proceeding.
The question is, of course, one of statutory intent. We do not think that Congress, which we cannot assume was unaware of the holding of the Abilene case that a common-law right of action to recover unreasonable common carrier charges is incompatible with a statutory scheme in which the courts have no authority to adjudicate the primary question in issue, intended by the saving clause of § 216 (j) to sanction a procedure such as that here proposed. It would be anomalous to hold that Congress intended that the sole effect of the omission of reparations provisions in the Motor Carrier Act would be to require the shipper in effect to bring two lawsuits instead of one, with the parties required to file their complaint and answer in a court of competent jurisdiction and then immediately proceed to the I. C. C. to litigate what would ordinarily be the sole controverted issue in the suit. No convincing reason has been suggested to us why Congress would have wished to omit a direct reparations procedure, as it has concededly here done, and yet leave open to the shipper the circuitous route contended for.
*475 To permit a utilization of the procedure here sought by the Government would be to engage in the very "improvisation" against which this Court cautioned in Montana-Dakota, supra, in order to permit the I. C. C. to accomplish indirectly what Congress has not chosen to give it the authority to accomplish directly. In the absence of the clearest indication that Congress intended that the Motor Carrier Act should preserve rights which could be vindicated only by such an improvisation, we must decline to consider a defense which "involves only issues which a federal court cannot decide and can only refer to a body which also would have no independent jurisdiction to decide . . . ."[14]Montana-Dakota, supra, at p. 255. The Government's reliance upon United States v. Western Pacific R. Co., 352 U. S. 59, is misplaced, for in that case, involving Part I of the Interstate Commerce Act, the authority of the I. C. C. to determine the reasonableness of past filed rates in aid of court litigation was undoubted. The case decided no more than that referral to the I. C. C. of the issue of "unreasonableness" involved in the shipper's defense to the carrier's timely Tucker Act suit was not foreclosed by the fact that affirmative reparations relief before the Commission would have been barred by limitations. It has no bearing on the question whether *476 a judicial remedy in respect of allegedly unreasonable past rates survived the passage of the Motor Carrier Act.
It is pointed out that the I. C. C. has long claimed the authority to make findings as to the reasonableness of past motor carrier rates embodied in tariffs duly filed with the Commission. It is true that in a series of cases beginning with Barrows Porcelain Enamel Co. v. Cushman Motor Delivery Co., 11 M. C. C. 365, decided in 1939, divisions of the Commission, and eventually the Commission itself, Bell Potato Chip Co. v. Aberdeen Truck Line, 43 M. C. C. 337, announced that the I. C. C. possessed such authority. But in these cases the anterior question now before us, whether a shipper has a right, derived from outside the statute, to put the question of the reasonableness of past rates in issue in judicial proceedings, was given only cursory consideration or else wholly ignored.[15] The cases devoted themselves to searching out authorization in the Act for I. C. C. participation, by adjudication as to past unreasonableness, in the vindication of whatever reparation rights might exist.[16] The *477 Government is able to point to only two cases in addition to the present ones, in the 24 years since passage of the Motor Carrier Act, in which courts have appeared to assume that the issue of reasonableness of past motor carrier rates was litigable,[17] and in neither of these cases was the question given other than the most cursory attention. Under these circumstances the issue before us cannot fairly be said to be foreclosed by long-standing interpretation and understanding.
We are told that Congress has long been aware that the Commission was of the view that a common-law action for recovery of unreasonable rates paid to a motor carrier, with referral to the Commission of the issue of unreasonableness, would lie, and that its failure to legislate in derogation of this view implies an approval and acceptance of it. But it appears that each time the Commission's views in this regard were communicated to committees of Congress, it was in connection with a request by the Commission for legislation which would have given to shippers a cause of action under the statute and granted to the Commission the authority to award reparations, and each time that request was rejected.[18] *478 Had Congress been asked legislatively to overrule the doctrines enunciated in Bell Potato Chip, supra, and declined to do so, that fact would no doubt have been entitled to some weight in our interpretation of the Act. But we do not think that from the failure of Congress to grant a new authority any reliable inference can permissibly be drawn to the effect that any authority previously claimed was recognized and confirmed.
Finally, it is contended that denial of a remedy to the shipper who has paid unreasonable rates is to sanction *479 injustice.[19] The fact that during the 24-year history of the Motor Carrier Act shippers have sought to secure adjudications in the I. C. C. as to the reasonableness of past rates on only a handful of occasions, despite the Commission's invitation to shippers to pursue that course in the line of cases culminating in Bell Potato Chip, supra, strongly suggests that few occasions have arisen where the application of filed rates has aggrieved shippers by motor carrier.[20] Furthermore, this contention overlooks the fact that Congress has in the Motor Carrier Act apparently sought to strike a balance between the interests of the shipper and those of the carrier, and that the statute cut significantly into pre-existing rights of the carrier to set his own rates and put them into immediate effect, at least so long as they were within the "zone of reasonableness." Under the Act a trucker can raise its rates only on 30 days' prior notice, and the I. C. C. may, on its own initiative or on complaint, suspend the effectiveness of the *480 proposed rate for an additional seven months while its reasonableness is scrutinized.[21] Even if the new rate is eventually determined to be reasonable, the carrier concededly has no avenue whereby to collect the increment of that rate over the previous one for the notice or suspension period. Thus although under the statutory scheme it is possible that a shipper will for a time be forced to pay a rate which he has challenged and which is eventually determined to be unreasonable as to the future, as when the suspension period expires before the I. C. C. has acted on the challenge, it is ordinarily the carrier, rather than the shipper, which is made to suffer by any period of administrative "lag."[22]
For the foregoing reasons the judgment of the Court of Appeals in each of these cases must fall.
Reversed.
MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK join, dissenting.
There can be no serious doubt that at common law a cause of action existed against carriers who charged unreasonable rates. See Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 436; Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 284 U. S. 370, 383.[1] Nor *481 can it be questioned that the Motor Carrier Act confirmed the common-law policy against unreasonable rates and in fact expressly made such rates illegal.[2] It is also clear that the Act attempted to preserve all pre-existing remedies which did not directly conflict with its aims.[3] Nevertheless the Court today holds that the statute abolished the common-law remedy by implication and left shippers helpless against carriers who have charged unreasonable and therefore illegal rates. To accomplish this result the Court relies essentially on two prior decisions of this Court; Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co., 341 U. S. 246, which I believe has virtually nothing to do with the issue, and Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, which, I think, supports a holding opposite to that which the Court makes today. Moreover, in reaching its conclusion, the Court overturns a long-standing and consistent I. C. C. interpretation of the Motor Carrier Act an interpretation which was based in large part on the Abilene case, which was first formulated by men who helped draft the Act, and which has been generally accepted by shippers, carriers, and Congress alike. I am unable to understand why the Court strains so hard to reach so bad a result.
The Motor Carrier Act, though largely patterned after the Interstate Commerce Act of 1887 regulating railroads, *482 had no counterpart of §§ 8, 9, 13 and 16 of that Act.[4] These sections provided two remedies either of which a shipper could pursue to recover damages suffered as a result of unlawful carrier rates or practices. One remedy was by complaint to the Commission the other by suit brought in an appropriate District Court of the United States. Both these remedies authorized imposition of reasonable attorneys' fees on a carrier should a claim reach the court and be decided in the shipper's favor. See Meeker v. Lehigh Valley R. Co., 236 U. S. 412, 432-433.
In Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, this Court considered the effect of these reparation sections on common-law actions by shippers for damages caused by rates alleged to be unlawful because unreasonable. The Court implied that the state court in which the shipper had sued had no jurisdiction since the congressional remedies in the reparation sections were complete and exclusive in themselves and supplanted the pre-existing common-law right of shippers to sue for damages caused by unreasonable rates, this right being deemed inconsistent with the statutory remedies; and held that the power to determine the reasonableness of rates was primarily and exclusively vested by the Act in the Commission. It did not hold, as the Court now assumes, that the existence of primary jurisdiction alone destroyed all court remedies. Accordingly, since the Abilene case, when the question of unreasonableness has arisen in court proceedings courts have often refused to dismiss the cause but have stayed the action pending I. C. C. determination of that issue. See e. g., Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U. S. 247; General Am. Tank Car Corp. v. El Dorado Terminal Co., 308 U. S. 422, 432-433; United States v. Western P. R. *483 Co., 352 U. S. 59, 62-70.[5] The Court today seems to decide instead that primary jurisdiction is inconsistent with court remedies of any kind, and that the mere omission of reparations provisions in the Motor Carrier Act showed a congressional purpose to deprive shippers of the common-law right to obtain damages resulting from unreasonable rates. It reaches this conclusion although to do so leaves shippers with no remedy at all however unreasonable and unlawful a past rate may have been, and although there is not a word in the Act, and nothing to which we have been directed in its history, that shows any congressional purpose to take away the pre-existing remedy.
On the contrary, since passage of the Motor Carrier Act in 1935, a steady line of decisions by the I. C. C. has interpreted that Act as leaving shippers the right to sue in the courts for damages resulting from unlawful rates. This action lay only where the rates had not previously been held reasonable by the Commission, cf. Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 284 U. S. 370, 387-388, and consisted of two parts, (1) a suit by a shipper in a court, (2) a determination by the Commission that the rates sued on had, in fact, been unreasonable or otherwise unlawful when charged. The first case of this kind, Barrows Porcelain Enam. Co. v. Cushman Motor Deliv. Co., 11 M. C. C. 365, was submitted to the Commission in April 1938, and handed down in February 1939. It was decided by Division 5 which was specially charged *484 with the administration of the Motor Carrier Act and was concurred in by Commissioner Eastman who had by then served on the Commission or as Coordinator of the Transportation System of the country for 17 years. He had drafted the 1935 Act and probably knew more about what it meant than anybody on this Court then or now.[6] Admitting that the Commission could not itself award reparations, Division 5 held, in Barrows, that it did have authority to pass on the reasonableness of past rates since unreasonable rates were unlawful under the Act. Significantly Division 5 stated, "This conclusion is, we believe, supported by the reasoning of the United States Supreme Court in Texas & P. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426." 11 M. C. C., at 367. Barrows was reaffirmed in early 1940 with Commissioner Eastman again on the panel.[7]
*485 In September 1940, after very extensive hearings, the Interstate Commerce Act was amended and broadened in many respects.[8] At the same time, water carriers were brought under Commission regulation. To achieve uniformity between the different parts of the Act, efforts were made to subject motor carriers to reparation proceedings before the Commission.[9] The representative of the motor carriers strenuously objected. The hearings before the Senate Committee on Interstate Commerce show that the objections were directed against subjection of motor carriers to Commission reparations not to common-law actions in the courts. Commission actions, it was stated, might result in the taxing of attorneys' fees in addition to damages and might thereby encourage "claim chasers."[10] The Committee members and the witnesses before Congress all appeared to recognize that suits could be filed in court. Thus the Chairman of the Committee stated "He has that right now. It does not add anything, as a matter of fact, to the rights of the shipper . . . . [I]f *486 you were afraid that the railroad might go and stir up a claim against [the truckers], they can do that now."[11] And the representative of the truckers answered "We are not fearful of that, but we are fearful of practices occurring where [the truckers] will be constantly harassed." To which a member of the Committee added "The objection is that under the existing law you have to go to the court to get relief and under the proposed law the Interstate Commerce Commission could give you relief?"[12] Commissioner Eastman also appeared before the Committee, two months after the Barrows opinion came down, and stated
"[M]otor carrier tariffs have been, by and large, very imperfect products, and while the situation is improving continually, much room for improvement remains.
"Where tariffs are poorly worded and imperfectly constructed, experienced traffic experts can often raise troublesome questions as to the applicability of the rates charged, and there are those who make this their business, obtaining their compensation from such reparation awards as they are successful in securing.
.....
"In the early stages of their regulation and tariff development, it was thought that the motor carriers might well be spared the burden of defending such claims before the Commission."[13]
Accordingly the Committee Report on the 1940 Act stated that the paragraph of the bill which would have *487 subjected the motor carriers to reparation claims before the Commission was changed
"because of motor carrier objections to awards of reparation by the Commission. Shippers have the right to recover in court any damages resulting from violations of the law by motor carriers or carriers by water." S. Rep. No. 433, 76th Cong., 1st Sess. 18. (Emphasis supplied.)[14]
It seems clear, therefore, that when the 1940 Motor Carrier Act was adopted, at least the Senate Committee was fully informed of an existing interpretation of the 1935 Act under which shippers could sue for damages on the basis of unreasonable rates.
After the passage of the 1940 Act, Divisions of the Commission continued to construe the Motor Carrier law to allow determinations of the reasonableness of past rates. In 1942, for example, the Commission did this in a case involving the same question presented by the Government in T. I. M. E., No. 68the reasonableness of a joint through rate which exceeds the aggregate of intermediate rates between the same points. The Commission held that on the facts presented the rates "were unreasonable. . . to the extent that they exceeded the corresponding aggregate . . . ." Kingan & Co. v. Olson Trans. Co., 32 M. C. C. 10, 12. Finally in Bell Potato Chip Co. v. Aberdeen Truck Line, 43 M. C. C. 337, the whole Commission reviewed the question to provide a "precedent for future guidance" and emphatically approved the Barrows line of cases. It established safeguards against frivolous or moot complaints but *488 reaffirmed the existence of court remedies for unreasonable rates and the need for Commission determinations of the fact of unreasonableness before the courts could award damages.
Both the Bell case and the Barrows case have been cited to Congressional Committees time and again. In 1947 and 1948 extended hearings were held before Senate and House Committees on bills to establish uniform statutes of limitations for court actions arising out of violations of the Commerce Act and to subject motor carriers and freight forwarders to Commission reparations.[15] Members of the I. C. C. in written statements, briefs and testimony, stressed to the Committees considering the bills both the existence of the court remedies described in the Bell case and the fact that few common-law actions were in fact undertaken because of the expense involved in a split procedure.[16] Witnesses for an against the bills accepted the rule of the Bell case.[17] Thus the representative of the freight forwarders, whose status under the Act is the same as that of motor carriers, referring to the Bell case said "It is the law today," and then added "If the Commission finds that the rates have been unreasonable in the past, damages may be obtained under the law as it stands today."[18] He opposed the proposed change because he felt that it would make it easier for shippers to obtain reparations where no damages *489 were actually suffered.[19] When the bills were reported by the Committees the provisions for reparations before the Commission were excluded. The report of the House Committee explained that reparations before the Commission were not available under the law as it stood. After stating that the bills originally had included reparation provisions before the Commission similar to those applied to rail carriers and that these had been dropped, the report incorporated a letter from the I. C. C. explaining the existence of the court remedy and pointing out the weaknesses of this remedy. The Committee then stated that legislation making additional reparations provisions applicable to motor carriers and freight forwarders was not at that time deemed desirable. It concluded that the other provisions, including a uniform statute of limitations in cases arising from the charging of tariffs different from those on file, should be enacted.[20] While Congress did not enact these measures before adjournment,[21] they were passed in the following Congress after Committee Reports which referred to the hearings of the prior two years.[22]
Once more, as late as 1957, after this Court's decision in Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co., 341 U. S. 246, the I. C. C. sought to have reparations before the Commission established. Again hearings were held; in these the Chairman of the I. C. C., the Under Secretary of Commerce, a representative of the freight forwarders and others unequivocally testified that a remedy *490 for unreasonable past rates was available through the courts.[23] This testimony by the representative of the freight forwarders caused the presiding member of the Subcommittee to ask "What does this bill propose that is different from what we now have? That is what I am trying to determine." To which the representative, opposing Commission reparations, replied: "It just adds some cumbersome machinery that we think will cause litigation."[24]
This Court has frequently had occasion to say that interpretations of statutes by agencies charged with their administration are entitled to very great weight.[25] Moreover, the legislative history of bills attempting to grant the I. C. C. power to award reparations goes far, in view of the arguments made against them, toward approving the original interpretation of the Motor Carrier Act made by Division 5 of the I. C. C. and Commissioner Eastman. Recently, the Commission has reaffirmed its interpretation which has stood for more than 20 years.[26] Against reaffirmance a dissent was written based on the belief that this Court's holding in Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co., 341 U. S. 246, required a new interpretation. The Court seems to stress the same contention here. Quite apart from the fact that the question actually up for decision in Montana-Dakota was whether the Federal Power Act created a federal cause of action and not whether it *491 destroyed common-law rights, I believe that there are important differences between the Power Act and the Motor Carrier Act which make the Montana-Dakota case wholly inapplicable here.
Admittedly Montana-Dakota and the statute it interpreted have some similarities to these cases and this statute. But unlike the Carrier Act the provisions of the Power Act under consideration in Montana-Dakota regulated wholesale rates, that is rates charged purchasers for resale, not rates charged retail customers.[27] The purpose of that Act was, nevertheless, to benefit consumers by holding down wholesale prices. Wholesalers whose purchase price was reduced prospectively could pass the reduction on to their customers, the consumers. In Montana-Dakota the Court indicated that the consumers would not be helped by ex post facto determinations of unreasonableness resulting in a refund to wholesalers. 341 U. S., at 254. The facts of the case lent themselves to such a finding. Damages were asked for a back period of many years; consumers had long since paid their rates on the basis of the unreasonable prices charged the wholesalers; and there was no reason to believe that any consumers who benefited from whatever lower prices the refund might allow would be the same ones who had paid the excessive rates. The Federal Power Commission, in an amicus brief, stressed these facts and argued that any refund would likely be a windfall providing an unjust enrichment to the wholesaler. Citing this brief the Court accepted the F. P. C. argument, 341 U. S., at 254, n. 11, over a vigorous dissent which indicated that perhaps ways of refunding the excess to consumers might be found. 341 U. S., at 265, 266. No similar problem exists under the Motor Carrier Act. The relevant sections were in large *492 measure designed to protect shippers,[28] and in fact the shippers are, in many instances, the ultimate parties on whom the burden falls. Both these cases are, of course, such instances. And even when the shippers are not necessarily the ultimate parties, the economics of the industry is such that windfalls to them are unlikely.
Similarly, other reasons which induced this Court's holding in Montana-Dakota are inapplicable here. In refusing to include in the Power Act provisions authorizing wholesalers to seek reparations before the Federal Power Commission, the Senate Committee which reported the bill said, "They are appropriate sections for a State utility law, but the committee does not consider them applicable to one governing merely wholesale transactions."[29] This report, unlike any in the Motor Carrier Act, is easily understood when read in the light of evidence presented to the Committee considering the Power Act. The reparation provisions of that Act were opposed by the National Association of Railroad and Utilities Commissioners, whose General Solicitor told the Committee:
"That is an entirely proper provision in a railroad statute. When a man goes to the railroad station with a load of goods to ship somewhere he has to ship at the rate that is fixed in the tariff. He must make the shipment then; and he ought to be able to come thereafter to the Commission and show that he was required to pay an unreasonable rate, if it was unreasonable, and to ask for a determination of a reasonable rate and get reparation that is due him for any overpayment. That is perfectly proper. But this bill relates only to service between the wholesale generating *493 or producing company and the distributing utility. We question whether the public interest will be served by giving any company the right to go ahead receiving service at the established rate for 2 years, and then to bring a complaint before the Federal Commission that the rate has been unreasonable."[30]
The testimony was emphasized, as shown above, in the briefs in Montana-Dakota.[31] Doubtless this history led the minority as well as the majority in that case to the view that "Congress did not intend either court or Commission to have the power to award reparations on the ground that a properly filed rate or charge has in fact been unreasonably high or low." 341 U. S., at 258. Since the history of the Motor Carrier Act points in the opposite direction there is no reason to apply the Montana-Dakota case to the Motor Carrier Act.
Moreover, if motor carrier shippers are deprived of court actions to recover for unreasonable rates, they are placed in a much worse position than wholesale power purchasers. 16 U. S. C. § 824d (e) authorizes the Power Commission to suspend rates for five months and, if a hearing on those rates is not concluded by that time, to order the power company to keep an accurate account of the amount and source of all money received. Should the rates be found unreasonable, the Commission can order the excess refunded with interest. The Motor Carrier Act, on the other hand, while authorizing suspension of rates, has no provision for refunds if hearings are not completed when the suspension expires. § 216 (g), 49 U. S. C. § 316 (g). Had there been such a provision in *494 the Carrier Act the Government would have been fully protected from the rates charged in the Davidson case, No. 96.
The Power Act and the Motor Carrier Act are quite different in language, scope, purpose and meaning. The Court in Montana-Dakota carefully limited its holding to the Power Act, e. g., 341 U. S., at 254. The arguments advanced in that context for the conclusive effect of power rates once filed are wholly inapplicable to rates under the Motor Carrier Act. In these Motor Carrier cases we have 20 years of Commission interpretation, in part by men who helped write the Act and who administered it from the time it first went into effect, to help us in deciding the question. Congress passed the 1940 revision of the Motor Carrier Act, apparently with full knowledge of the Commission rulings which indicated that shippers could challenge, in the courts, carrier-fixed rates so long as these rates had not been expressly held reasonable by the Commission. Cf. Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 284 U. S. 370. The changes made in 1949, and those not made in 1957, again indicate a reliance on the Commission's interpretation. I believe that interpretation should govern here, and therefore would affirm the judgments of the Courts of Appeals in both these cases.
NOTES
[*] Together with No. 96, Davidson Transfer & Storage Co., Inc., v. United States, on certiorari to the United States Court of Appeals for the District of Columbia Circuit.
[1] Interstate Commerce Act, Part II, 49 Stat. 543, as amended, 49 U. S. C. § 301 et seq.
[2] See Motor Carrier Act §§ 216 (e), (g), 217 (b), (c), 49 U. S. C. §§ 316 (e), (g), 317 (b), (c).
[3] This part of the charges was that represented by a "New York State Surcharge," included by Davidson in its rate to recoup the cost of a New York ton-mile truck tax. The tariff including the surcharge had been filed to become effective October 8, 1951. The I. C. C. had suspended the tariff for the maximum period permitted by the Act, but since the inquiry as to its reasonableness was not completed within the suspension period it went into effect on May 8, 1952, and was in effect at the time of shipment. The I. C. C. subsequently found the surcharge to be unreasonable and ordered its excision from Davidson's rates, 62 M. C. C. 117. This order was purely prospective and did not affect the shipments involved here.
[4] In our view of these cases it becomes unnecessary to consider Davidson's alternative contention that in any event the General Accounting Office had no right under § 322 of the Transportation Act of 1940 to deduct from the carrier's charges the amount claimed by the United States to have been unreasonable.
[5] Section 216 (j), 49 U. S. C. § 316 (j), provides that "Nothing in this section shall be held to extinguish any remedy or right of action not inconsistent herewith."
[6] Section 205 (a) of the Power Act, 49 Stat. 851, 16 U. S. C. § 824d (a), provides that "All rates and charges . . . and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful."
[7] 49 U. S. C. § 8.
[8] 49 U. S. C. § 9.
[9] 49 U. S. C. §§ 13 (1), 16.
[10] Hearings before Senate Committee on Interstate and Foreign Commerce on S. 1194, 80th Cong., 2d Sess., pp. 1, 5, 11-12.
[11] See Hearings before Senate Committee on Interstate and Foreign Commerce on S. 378, 85th Cong., 2d Sess., pp. 3, 12.
[12] Such a right was assumed by this Court to have existed at common law in Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 436, and Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 284 U. S. 370. But see Aitchison, Fair Reward and Just Compensation, Common Carrier Service, p. 10, suggesting that the common-law right is one to be free from undue discrimination, rather than from mere exorbitance.
[13] Section 22 of the Interstate Commerce Act provided at the time of the Abilene case, and continues in substance to provide, that: "Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies."
[14] It is noteworthy that in 1949, when Congress added to the Motor Carrier Act a statute of limitations provision governing suits by and against carriers involving charges, such provision was made applicable only to suits for "overcharges," defined to mean "charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the Commission." 49 U. S. C. § 304a. It would be surprising, given the policy of uniformity reflected in this provision, for Congress not to have also added a statute of limitations provision applicable to suits on account of unreasonable rates, had a cause of action with respect to such rates been deemed to exist. Compare 49 U. S. C. § 16 (3) (b), providing a limitations provision for complaints for the recovery of damages "not based on overcharges" from rail carriers.
[15] See, e. g., United States v. Davidson Transfer & Storage Co., Inc., 302 I. C. C. 87, 90-91, involving the same parties as those now before us in No. 96. Barrows, relied on heavily in the dissenting opinion because it was decided by a Division of the I. C. C. of which Commissioner Eastman, previously Federal Coordinator of Transportation and a principal architect of the Motor Carrier Act, was a member, does not even suggest that a common-law action to recover unreasonable rates might be maintainable. Rather it referred to findings as to the reasonableness of past rates only as "valuable future guides to shippers and carriers." 11 M. C. C., at 367.
[16] The Bell case purported to find such authorization in §§ 216 (e) and 204 (c) (49 U. S. C. §§ 316 (e), 304 (c), although both these provisions appear in terms directed only to the authorization of findings and orders operating solely prospectively. It relied also on the provisions of the statute which impose on the carrier the duty of maintaining reasonable and nondiscriminatory rates. 49 U. S. C. § 316 (b), (d). But see Montana-Dakota Utilities Co. v. North-western Pub. Serv. Co., supra.
[17] New York & New Brunswick Auto Express Co. v. United States, 130 Ct. Cl. 339, 126 F. Supp. 215; United States v. Garner, 134 F. Supp. 16 (D. C. E. D. N. C.).
[18] See notes 10, 11, supra.

It is suggested that Congress was fully informed at the time of passage of the Transportation Act of 1940 of "an existing interpretation" of the Motor Carrier Act which would allow common-law actions for the recovery of unreasonable rates. We do not so read the legislative history relied upon. On the contrary, Commissioner Eastman, testifying before the Senate Committee, appeared to distinguish between the availability of a judicial remedy in respect of inapplicable tariff rates and the unavailability of such a remedy in respect of rates claimed to be "unreasonable" though embodied in a filed tariff. The Commissioner said:
"So far as reparation is concerned, there is no reason why these provisions should not be applied to motor carriers as well as to railroads. They were omitted from the Motor Carrier Act only because of the desire to lighten the burdens of the motor carriers in the early stages of regulation, in the absence of any strong indication of public need. Motor carriers have practically no traffic which is noncompetitive, and there is little danger that they will exact exorbitant charges. Since the Motor Carrier Act became effective in 1935, the Commission has not once had occasion to condemn motor-carrier rates as unreasonably high. I don't think we have had any complaints to that effect. It follows that there is nothing to indicate that shippers need provisions to enable the Commission to award reparation for damages suffered because of unreasonable charges.
"The occasion for reparation from motor carriers would chiefly arise, therefore, in the event of overcharges above published tariff rates. Shippers can recover such overcharges in court as the law now stands." (Emphasis added.) Hearings before Senate Interstate Commerce Committee on S. 1310, S. 2016, S. 1869, and S. 2009, 76th Cong., 1st Sess., pp. 791-792.
See also Hearings at p. 132, where Senator Reed asked a truckers' representative opposing the addition of reparations provisions to the Motor Carrier Act "[I]f a shipper by railroad, which is one from of common carrier, now has a remedy at law in the way of damages which he may have suffered through a collection of an unreasonable rate, and if we are trying to make uniform regulations, why should a common carrier by truck be exempted from the right or remedy of the shipper against an unreasonable charge any more than any other form of common carrier?" The reparations provision was subsequently stricken from the bill.
[19] But see Jaffe, Primary Jurisdiction Reconsidered, 102 U. of Pa. L. Rev. 577, 589, commenting on Bell Potato Chip, supra: "It is, to be sure, doubtful that reparations in such a case serve a useful function. Rates are under continuous scrutiny. Administrative condemnation implies new circumstances or new understanding rather than serious past injustice. And, as Mr. Justice Jackson observes in the Montana-Dakota case, the overcharge has usually been passed along by the one who paid it to some undiscoverable and unreimbursable consumer."
[20] It was recognized at the time of passage of the Motor Carrier Act that competitive conditions in the trucking industry were such that the possibility of unreasonably high rates presented no problem. Commissioner Eastman, who had conducted an inquiry into the motor carrier industry, stated during the hearings preceding passage of the Act that "I do not recall that there were any complaints based upon excessive charges." Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 5262, 6016, 74th Cong., 1st Sess., p. 32. See also his 1939 statement before the Interstate Commerce Committee of the Senate, quoted at note 18, supra.
[21] See Motor Carrier Act, §§ 217 (c), 216 (g), 49 U. S. C. §§ 317 (c), 316 (g).
[22] Counsel for the Government stated on oral argument that the situation presented in No. 96, where the suspension period expired before the adjudication of the reasonableness of the challenged rate had been completed, arises very infrequently, since the suspension period is ordinarily ample to permit such adjudication.
[1] "The exaction of unreasonable rates by a public carrier was forbidden by the common law. . . . The public policy which underlay this rule could . . . be vindicated . . . in an action brought by him who paid the excessive charge, to recover damages thus sustained." 284 U. S., at 383.
[2] 49 Stat. 543, as amended, 49 U. S. C. §§ 301-327. Section 216 (d) of the Act, as amended, 49 U. S. C. § 316 (d), reads in part: "All charges made for any service rendered or to be rendered by any common carrier by motor vehicle engaged in interstate or foreign commerce in the transportation of passengers or property . . . shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof, is prohibited and declared to be unlawful." See also § 216 (b), 49 U. S. C. § 316 (b).
[3] Section 216 (j), 49 U. S. C. § 316 (j) states "Nothing in this section shall be held to extinguish any remedy or right of action not inconsistent herewith."
[4] See 24 Stat. 382-384, as amended, 49 U. S. C. §§ 8, 9, 13, 16.
[5] Conversely many instances have been cited of shippers seeking only a determination of the reasonableness of a past practice from the I. C. C. and reserving their rights to obtain damages later in the courts. See generally the discussion of this problem in United States v. Interstate Commerce Comm'n, 337 U. S. 426, 464-466 (dissenting opinion). See also United States v. Interstate Commerce Comm'n, 337 U. S. 426 (opinion of the Court).
[6] See Hearings, Senate Committee on Interstate Commerce on S. 1310, S. 2016, S. 1869, S. 2009, 76th Cong., 1st Sess. 756-757, 762, 785.
[7] Dixie Mercerizing Co. v. ET & WNC Motor Transp. Co., 21 M. C. C. 491. The Court suggests that this line of cases gave only cursory treatment to the question of whether a court remedy existed. But in Bell Potato Chip Co. v. Aberdeen Truck Line, 43 M. C. C. 337, 341-343, the I. C. C. stated in part:

"To hold that a motor carrier which has violated any of these prescribed duties is immune to civil liability to one injured thereby while rail and water carriers similarly offending must respond in damages would be not only at variance with the fundamental rule of ubi jus ibi remedium but would also disregard the provisions of sections 216 (j), 217 (b), and 22, which preserve all common-law and statutory remedies. The statute, by declaring unlawful and prohibiting unreasonable and discriminatory rates, has superseded the common-law right but has not abrogated remedies heretofore recognized. See Texas & P. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426; Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U. S. 247, 258. . . .
"How, then, is a shipper who has been injured by the exaction of an unlawful motor-carrier rate to obtain redress against an unwilling carrier? The answer is, in the courts. . . .
.....
". . . In this connection, it may be noted that it is a recognized practice to hold in abeyance court proceedings pending the determination by the Commission of administrative questions. Eastern-Central Motor Carriers Assn. v. United States, 321 U. S. 194; General American Tank Car Corp. v. El Dorado Term. Co., 308 U. S. 422; Mitchell Coal & Coke Co. v. Pennsylvania R. Co., supra; Morrisdale Coal Co. v. Pennsylvania R. Co., 230 U. S. 304, 314; Southern Ry. Co. v. Tift, 206 U. S. 428, 434."
[8] 54 Stat. 898.
[9] See, e. g., statement of Senator Reed, Hearings, Senate Committee on Interstate and Foreign Commerce on S. 1310, S. 2016, S. 1869, S. 2009, 76th Cong., 1st Sess. 132.
[10] Id., at 129-133.
[11] Id., at 130.
[12] Ibid.
[13] Id., at 792.
[14] The statute expressly declares unreasonable rates unlawful. See note 2, supra. Barrows Porcelain Enam. Co. v. Cushman Motor Deliv. Co., 11 M. C. C. 365, confirmed this fact as to past unreasonable rates.
[15] See Hearings, House Committee on Interstate and Foreign Commerce on H. R. 2324, H. R. 2295, 80th Cong., 1st Sess.; Hearings, Senate Subcommittee of the Committee on Interstate and Foreign Commerce on S. 571-H. R. 2759, S. 935, S. 1194, S. 290-2426, 80th Cong., 2d Sess.
[16] Hearings, House Committee, supra, n. 15, at 5-6; Hearings, Senate Subcommittee, supra, n. 15, at 8-16.
[17] See, e. g., Hearings, House Committee, supra, n. 15, at 41-47, 52.
[18] Id., at 41, 42.
[19] Id., at 42-47.
[20] H. R. Rep. No. 208, 80th Cong., 1st Sess. 3, 4.
[21] The bill passed the House of Representatives but the Senate did not debate it before adjournment. See H. R. Rep. No. 766, 81st Cong., 1st Sess. 1; S. Rep. No. 83, 81st Cong., 1st Sess. 2.
[22] 63 Stat. 280. See H. R. Rep. No. 766, 81st Cong., 1st Sess.; S. Rep. No. 83, 81st Cong., 1st Sess.
[23] Hearings, Senate Subcommittee of Committee on Interstate and Foreign Commerce on S. 377, S. 378, S. 937, S. 939, S. 943, 85th Cong., 1st Sess. 3, 12, 49, 116-117, 137.
[24] Id., at 1, 117.
[25] See, e. g., Fawcus Machine Co. v. United States, 282 U. S. 375, 378; Skidmore v. Swift & Co., 323 U. S. 134, 140; cf. Cammarano v. United States, 358 U. S. 498.
[26] United States v. Davidson Transfer & Storage Co., 302 I. C. C. 87.
[27] 41 Stat. 1063, as amended, 16 U. S. C. §§ 791a-825r.
[28] See testimony of Commissioner Eastman in Hearings, Senate Subcommittee on Interstate and Foreign Commerce on S. 1310, S. 2016, S. 1869, S. 2009, 76th Cong., 1st Sess. 792.
[29] S. Rep. No. 621, 74th Cong., 1st Sess. 20.
[30] Hearings, House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess. 1685.
[31] See Brief of Respondent Northwestern Pub. Serv. Co., pp. 26-27; Brief of the Federal Power Commission as amicus curiae, p. 13.