**UNITED STATES of America, Plaintiff,**

v.

**Maxwell Courtney GARNER, Defendant.**

**Civ. No. 657.**

United States District Court
E. D. North Carolina,
Raleigh Division.

Dec. 17, 1964.

Robert H. Cowen, U. S. Atty., Gerald L. Bass, Asst. U. S. Atty., Raleigh, N. C., and Norma L. Holloway, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

Howard E. Manning, Raleigh, N. C., for defendant.

CRAVEN, District Judge.

This case was begun November 12, 1952, and is the oldest civil action now pending in the Eastern District of North Carolina. The controversy itself is twenty years old. It arises from an effort by the United States to recover alleged overpayments received by Garner for the transportation of government property during the latter part of World War II.

The complaint filed by the United States alleged simply the right to recover any overpayment, and that an audit showed that the defendant had been overpaid $30,372.18 "in that numerous bills submitted by the defendant and paid by the plaintiff exceeded the applicable rate limitations". Subsequently, the complaint was amended to allege overpayments in the amount of $80,465.08, and that amount was reduced by consent of counsel for the United States at a recent hearing (November 23, 1964) to approximately $69,000.00. If interest is recoverable, it would amount to about 120 percent of the principal amount.[1]

The case came on for trial before the late Judge Don Gilliam in 1955. Judge Gilliam, on September 12, 1955, filed a "Memorandum by the Court with Findings of Fact and Conclusions of Law". United States v. Garner, 134 F.Supp. 16 (E.D.N.C.1955). On the same date, he filed a "Judgment and Order" and referred to the Interstate Commerce Commission the question of determining "what were reasonable rates for the shipments involved". He retained the case "for further consideration and orders and judgments upon determination of the question by such Commission *and in accordance therewith.*" (Emphasis mine.)

In his memorandum opinion, Judge Gilliam found that Garner determined his rates for hauling airplane engines by following the class rates for the classification "airplane parts", which are 125 percent of first-class rates, rather than the rates for the classification "internal combustion engines", which are 40 percent of first class. The United States contended the latter to be the proper charge. This is the heart of the controversy: what is the proper rate which should have been charged?

Judge Gilliam considered it a rate-fixing problem for the Commission rather than a legal question for the court. Apparently, the United States agreed, and, pursuant to Judge Gilliam's judgment dated September 12, 1955, began in 1958 a proceeding before the Interstate Com-

1. But see United States v. Garcia & Diaz, Inc., 291 F.2d 242 (2d Cir. 1961), where interest was denied in a similar fact situation.

merce Commission to determine what were reasonable rates for the shipments involved. When the I.C.C. refused[2] to rule on the matter on the ground that it lacked jurisdiction to do so, the United States prosecuted an action in the United States District Court for the District of Columbia to compel the Interstate Commerce Commission to act and to make the determination.

The effort begun in 1955 to resolve the controversy on the basis of reasonableness of rates ended on the 24th day of January, 1964, when the District Court for the District of Columbia, without opinion, granted the I.C.C.'s motion for summary judgment dismissing the complaint of the United States.

Meanwhile, back in North Carolina, the parties and the court awaited I.C.C. advice and determination. When it became clear that they waited in vain, the case was put back on a "trial calendar" for the undersigned district judge for Monday, November 23, 1964. It was "heard" on that day.

The parties were unable to agree even on the nature of the current proceeding in which they were participating. The United States insisted it was a resumption of trial on the merits, whereas Garner insisted that the trial had been conducted in 1955 and that the matter was again before the court purely for a hearing on Garner's motion for summary judgment and dismissal. Over Garner's continuing objection to every question, and for the purpose of preventing and making unnecessary any further hearing of any sort, the court permitted the United States to offer additional evidence to that taken in 1955. Careful examination of the 1955 record indicates that the evidence recently received on November 23, 1964, is largely repetitious. Indeed, the same witness testified on November 23, 1964, who had testified in 1955.

This case has been tried at least once, if not twice. The United States was at liberty in 1955 to pursue any theory it chose in its attempt to recover excess charges. Judge Gilliam concluded that the case presented nothing but a rate-fixing problem for the Interstate Commerce Commission. Although he found facts with respect to the disparate rates for airplane parts as compared with internal combustion engines, he failed and refused to find which of these rates was applicable, and concluded that neither was. His conclusion was clearly correct. United States v. Garner, supra, 134 F. Supp. at 19.

The United States now urges that Garner is liable to refund overcharges because he represented on his bills that the rates charged were no higher than the lowest available rates for the transporting of similar merchandise, and that the representation was incorrect. It is a sound theory. United States v. Garcia & Diaz, Inc., 291 F.2d 242 (2d Cir. 1961); Shutt v. United States, 218 F.2d 10 (5th Cir. 1954).

Judge Gilliam failed to make any special findings of fact pertinent to the misrepresentation theory. He was not requested to do so at the trial, nor within ten days thereafter, as contemplated by Rule 52 of the Federal Rules of Civil Procedure, nor at any time subsequently.

What is the effect of the failure to find facts relating specially to the misrepresentation theory? Can the United States now capitalize upon such failure caused and brought about by the Government's own preoccupation with another theory? Does it mean the case was only partially tried although the parties and the court intended final adjudication?

█ I interpret Judge Gilliam's judgment of September 12, 1955, as an adjudication of the whole case, including all possible theories of recovery, to which the United States took no exception—formal or otherwise. This interpretation finds support in the language of the judgment itself: the court retained jurisdic-

2. Initially, a Hearing Examiner ruled against the United States and in favor of Garner on the merits. His report was never adopted by the Commission.

tion purely to implement the decision of the I.C.C. as to reasonableness (a decision that was never to come) *"and in accordance therewith."*

In his memorandum of decision, Judge Gilliam plainly intended to dispose of the *whole case.* He said "the sole question is whether * * * there is a legal question for the Court's decision *or* rate-fixing problem for the Commission."

When Judge Gilliam referred the case to the I.C.C., he adjudged that the United States was not entitled to recover on any other possible theory. In effect, he dismissed the case and all other "causes of action" contained in it—retaining only a *limited* jurisdiction, i. e., to implement an I.C.C. determination that was never to come.

It is too late now, nine years after the trial before Judge Gilliam, for the Government to insist that the facts be specially found with respect to the newly-conceived misrepresentation theory. The judgment and memorandum of decision of September 12, 1955, in view of the long acquiescence of the United States, may properly be interpreted to embrace a finding that the United States failed to sustain its burden of proof on the misrepresentation theory, and it is so interpreted.

■ During the trial in 1955, Judge Gilliam interpreted the position of the Government to be that it was entitled to recover on either one of two theories: (1) that the applicable tariff was the lower one (internal combustion engines), or (2) the higher rate charged was unreasonable. Judge Gilliam ruled against the United States on the first theory and referred the second theory to the Interstate Commerce Commission for inquiry and determination. The United States acquiesced. Having ridden two horses into the ground, the United States now seeks to mount a third. Having contended for so long that the question was one of reasonable rates, the Government now

contends that the question of reasonable rates is not involved. This switch is required by T.I.M.E. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959). Under that decision, neither this court nor the Interstate Commerce Commission has authority to pass upon allegations of unreasonableness of motor carrier charges for past shipments, whether or not tariffs providing rates therefor are lawfully on file. Cf. Hewitt-Robbins v. Eastern Freight Ways, 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962).

■ The United States now insists, in effect, on a second trial nine years later on the basis of a theory which was not urged at the first trial but which could just as well have been. Ordinarily, a second trial will not be accorded on the basis of a new theory. Rule 59, Barron & Holtzoff, 1304, p. 360.

Alternatively, assuming that Judge Gilliam's order was not final (it has been decided otherwise) nothing remains but to rule on the Government's third, and it is to be hoped, last theory.

■ Considering the evidence offered in 1955 *and* recently, I fail and refuse to find that there was misrepresentation by Garner on the vouchers for payment, and I find instead that the United States has failed to sustain its burden of proof with respect to such misrepresentation. There is no substantial evidence in the record of the 1955 trial nor in the record of the hearing before me tending to show that other available carriers would have hauled the shipments in question at the low rate for internal combustion engines rather than at the high rate for airplane parts,[3] or at any other rate lower than that charged. There is no substantial evidence tending to show that the rates charged by Garner were in excess of the lowest net rates available for the Government. On the contrary, the evidence tends to show that Garner was pressed into service to haul government property

---

3. Nothing was shown, for example, about the density and value of the particular airplane engines. This failure was es-

pecially noted by the I.C.C. Hearing Examiner. Hearing Examiner's Report, p. 16 (1959).

because of the war emergency and the lack of available carriers authorized to haul such shipments. The word "available" in the certification should not be given critical significance, but neither should it be ignored. This is not a case of numerous carriers making the exact same haul before and after the date involved, as was United States v. Garcia & Diaz, Inc., supra. It is impossible to determine from the evidence whether other carriers would have, at that time, applied rates for internal combustion engines or airplane parts or some other rate not disclosed by the evidence—assuming availability of such carriers.

A judgment will be entered that the United States have and recover of Garner nothing and that the action be dismissed.